**In re TUGGLE PONTIAC–BUICK–GMC, INC., formerly Tuggle Chevrolet-Olds, Inc., Debtor.**

**William L. LANCASTER, III, Trustee, Plaintiff,**

v.

**CITY AND COUNTY BANK OF WASHINGTON COUNTY, Defendant.**

**Bankruptcy No. 3–82–01645.**
**Adv. No. 3–83–0131.**

United States Bankruptcy Court,
E.D. Tennessee.

June 20, 1983.

Powell & Epps, Ferdinand Powell, Jr., Jack D. Hodges, Johnson City, Tenn., for plaintiff.

Emerson & Emerson, John W. Emerson, Johnson City, Tenn., for defendant.

### MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

#### I

On September 10, 1982, some 47 days before the filing of its bankruptcy petition, the debtor, Tuggle Pontiac-Buick-GMC, Inc., formerly Tuggle Chevrolet-Olds, Inc., repaid to C & C Bank the sum of $20,000.00 on an unsecured note in the face amount of $75,000.00.[1] The plaintiff trustee seeks to recover this payment as a preference, 11 U.S.C.A. § 547(b) (1979).[2] Only one of the five elements necessary to establish an avoidable preferential transfer is at issue: Whether the debtor was insolvent at the time of the transfer, § 547(b)(3).

Bankruptcy Code § 547(f) states that for the purposes of § 547, "the debtor is pre-

---

1. Payment was made by a check payable to United American Bank, the predecessor of C & C Bank of Washington County. According to Charles Hurt, the Bank's vice-president, the Bank became concerned when it discovered the president of the debtor corporation had taken a lien on corporate assets to secure an indebtedness to him. Hurt thereupon demanded payment.

2. [T]he trustee may avoid any transfer of property of the debtor—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
    (A) on or within 90 days before the date of the filing of the petition;

    (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C.A. § 547(b) (1979).

sumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Thus, this presumption requires the defendant Bank to come forward with some evidence to rebut the presumption of the debtor's insolvency.[3] The only evidence on this issue submitted by the defendant Bank is the testimony of Eugene H. Tuggle, owner and president of the debtor, and an "operating report" for the period January 1, 1982, through July 30, 1982 (Ex. 5).[4]

## II

Tuggle purchased the assets of the debtor, formerly Griffith Motors, Inc., in April 1981. He testified he paid a $150,000.00 "premium" when he purchased the business.[5] Presumably, this "premium" represented payment for the intangible assets, (goodwill, etc.) of Griffith Motors. Tuggle further testified that the "operating report" accurately reflected the financial condition of the company in July 1982, and that the company had a "going concern" value—with goodwill valued at $175,000.00—when the debtor paid the Bank $20,000.00 on September 10th. However, Tuggle also testified that he had been attempting to sell the business for some time but that no sale had been consummated.

The "operating report" is not a balance sheet. It was prepared in-house; it is unverified. Although it reflects a purported "total net worth" of $85,315 (assets $2,896,-202; liabilities $2,810,887) as of July 30, 1982, its accuracy is totally negated in view of the debtor's financial condition some three months later when it filed a voluntary chapter 7 petition in bankruptcy. For example, the report indicates no notes payable exist other than those for new vehicles and demonstration models. Yet the defendant Bank held an unpaid $75,000 note when the "operating report" was completed. Furthermore, even the "operating report" shows net working capital (current assets less total liabilities) to be minus $98,579.

More illuminating and far more realistic than Tuggle's testimony and the "operating report" of July 30, 1982, is Tuggle's verified statement of the debtor's assets and liabilities executed on November 16, 1982 (Ex. 6). Priority debts total $88,515.21, secured debts $2,312,869.39, and unsecured trade debts (undisputed) $390,520.22, for an aggregate indebtedness of $2,791,904.82. After taking into consideration an obvious error in the debtor's bankruptcy schedules—the omission from assets of 168 motor vehicles surrendered to GMAC shortly before bankruptcy despite scheduling a claim in the amount of $1,678,059.49 secured by the surrendered vehicles—the total value of the debtor's assets was less than its liabilities when the bankruptcy petition was filed. Accepting *arguendo* Tuggle's testimony that the value of the debtor's inventory upon filing bankruptcy was more than $2,000,000.00, the liabilities of the debtor still clearly exceeded its assets when the bankruptcy case was commenced.[6] The scheduled value of assets other than motor vehicle inventory is only $506,967.14. The sum of these amounts is still substantially less than $2,791,904.82, the debtor's aggregate indebtedness. Furthermore, the valuation of the debtor's assets appears to be

3. Fed.R.Evid. 301, *Presumptions in General in Civil Actions and Proceedings.* In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

4. In its brief, the Bank refers to the report as a "General Motors' Computer statement." Mr. Tuggle testified that similar operating reports were available through August 30th and September 30th. No reason was advanced, however, for the failure of the parties to introduce those reports.

5. Prior to this purchase, Tuggle had sold a South Carolina automobile dealership for some $50,000.00–$75,000.00 "premium."

6. The value of the debtor's General Motors' motor vehicle inventory was only $1,764,413 as of July 30, 1982, according to the debtor's "operating report" ending July 30, 1982.

inflated: an $8,200.00 bank deposit included as an asset was seized by another bank previous to the discontinuation of business by the debtor, and accounts receivable in the scheduled amount of $49,993.69 have produced only between $13,000–$14,000. Additionally, practically all other assets have been abandoned as burdensome.[7] According to the trustee's testimony, assets realized to date total approximately $36,-500.00.[8] The only principal asset remaining in the estate is two memberships in the Johnson City Country Club.

### III

■ The definition of "insolvent" is set forth in paragraph (26) of Bankruptcy Code § 101. It is adopted from former § 1(19) of the Bankruptcy Act. An entity is insolvent if its debts are greater than its assets, at a fair valuation, exclusive of both property which may be exempted and property which has been fraudulently concealed or transferred. This is the traditional balance sheet test of insolvency.

■ In this case neither the plaintiff nor the defendant submitted a balance sheet reflecting the debtor's financial condition on the critical date. Nonetheless, proof of insolvency at a reasonable time subsequent to the date of the alleged preferential payment, accompanied by proof that no substantial change in the debtor's financial condition occurred during the interval, is evidence of insolvency on the earlier date, under the usual presumption that a condition known to exist is presumed to have existed for a reasonable period of time prior thereto. 3 Collier on Bankruptcy, ¶ 60.31 (14th Ed.1975).

■ The court has no hesitancy finding the debtor was insolvent on September 10, 1982, the date of the disputed transfer. Even if the court accepts Tuggle's testimony on the value of the debtor's motor vehi-

cle inventory and the inflated representations of the value of remaining assets, the debtor's liabilities exceeded its assets, including its motor vehicle inventory, by approximately $200,000, when the debtor's petition was filed on October 27, 1982. Tuggle testified there had been "no appreciable change" in the debtor's financial position between these two dates. Apart from the debtor's surrender of possession of its motor vehicle inventory to GMAC, the record is completely devoid of any sudden calamity or other event resulting in a rapid deterioration of the debtor's assets between September 10th and October 27, 1982. All of the debtor's principal assets were mortgaged in excess of their realizable value. Assets remaining in the estate are probably insufficient to even pay priority debts in full. Unsecured creditors will receive, if anything, a very small dividend.

Furthermore, the proof introduced by the defendant—the unverified "operating report" and Mr. Tuggle's testimony that on September 10th the debtor had a "going concern" value—is insufficient to overcome the statutory presumption of insolvency, 11 U.S.C.A. § 547(f) (1979). Tuggle and the Bank provided nothing more than mere self-serving statements to back the going concern or goodwill claim. Typical indicators of goodwill, such as a record of profitable operation over a period of time, a valuable customer list, or a trade name developed by the company are not present in this case. Further, Tuggle had been attempting to sell the company for a period of months—unsuccessfully. The evidence submitted by the defendant is simply inadequate to rebut the presumption.

In *Coombs v. Merchants Bank*, 161 F.2d 858 (2d Cir.1947), the evidence showed that the debtor was hopelessly insolvent on January 23, 1943, when an involuntary petition was filed against it. Through a scheme of

---

7. The abandoned assets include all "current inventory," including the motor vehicle inventory securing a GMAC scheduled indebtedness of $1,678,059.49, all "parts inventory," a 600 Holmes wrecker, a computer, all furniture, fixtures, and equipment.

8. This sum includes a compromise payment in the amount of $22,000.00 paid by GMAC on or about December 17, 1982. The compromise effected a settlement of all claims in the debtor's case between the trustee and GMAC.

detailed figures outlined in its briefs, the debtor purported to show it was solvent on both December 7, 1942, and December 26, 1942. The court noted that this argument proved too much. "For defendant does not explain why, if the contention is sound, the debtor's condition changed so astonishingly in the succeeding month." *Coombs,* 161 F.2d at 859–60.

In the case before this court the Bank failed to show any material change in the debtor's financial condition between September 10th and October 27th. In fact, proof submitted by the Bank is to the contrary—Tuggle testified there was no appreciable change in the debtor's financial condition during this period.

The court finds that the proof introduced by the defendant Bank is insufficient to rebut the statutory presumption of insolvency. The court further finds, however, that even if the presumption of insolvency has been rebutted, the trustee has carried his ultimate burden of proof of insolvency.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.