**In re EDWARD M. JOHNSON & ASSOCIATES, INC., Debtor.**

**Leon STEINBERG, Trustee, Plaintiff,**

v.

**Edward M. JOHNSON, Defendant.**

Bankruptcy No. 3–84–00813.

Adv. No. 3–85–0930.

United States Bankruptcy Court, E.D. Tennessee.

May 30, 1986.

W. Morris Kizer, Frantz, McConnell & Seymour, Knoxville, Tenn., for plaintiff.

Craig J. Donaldson, John S. Hicks, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Asserting rights as a third party beneficiary under a stock purchase agreement, the trustee seeks judgment against the defendant, the sole stockholder and former president of the debtor, in the amount of $81,229.81. Further, the trustee alleges a fraudulent transfer and seeks an additional judgment against the defendant in the amount of $154,350.80, plus prejudgment interest.

1. As of the time of the employment agreement the defendant owned only 40% of the outstanding stock of the debtor. (Robert Blow owned 40%, and Buford Communications owned the

## I

An involuntary petition was filed against the debtor, Edward M. Johnson & Associates, Inc., on May 15, 1984, and was subsequently sustained.

The debtor was incorporated in or around January 1981. At all times relevant herein, the debtor, a Tennessee corporation, held itself out to be a "full-service communications consulting firm" which, for a fee, prepared applications to be submitted to the Federal Communications Commission (FCC) for the issuance of licenses for broadcast facilities, including low power television, FM radio, AM radio and full service television. Among the services offered by the debtor were feasibility studies, channel availability studies, site location, engineering work incident to the application, the preparation of the application and submission of the application on behalf of the client to the FCC.

On September 8, 1982, the defendant entered into an "Employment Agreement" with the debtor.[1] Under the terms of the agreement defendant was to be initially employed as an executive of the debtor for a period of sixty (60) months from September 8, 1982.

The agreement contained in part the following provision regarding salary:

*Salary.* Employer agrees to pay to Executive, as salary for the services to be rendered by executive under or pursuant to this Agreement, an amount equal to One Hundred Thousand Dollars ($100,-000) per annum, commencing as of the Effective Date, payable in equal monthly installments or such other installments as may be mutually agreeable to the parties.

Exhibit 35, ¶ 3.

In addition, the agreement contained the following provisions regarding the payment of a bonus:

remaining 20%.) The defendant did not become the sole shareholder of the debtor until 1983.

4. *Bonus.* For the performance of his services hereunder during Employer's fiscal year 1982, Executive shall be entitled to receive a bonus in an amount to be determined in the sole discretion of the Board of Directors of Employer; *provided, however,* that no such bonus shall be declared or paid until all amounts due to Buford Television of Maryland, Inc., a Texas corporation ("BTM") with respect to Employer's fiscal year 1982 pursuant to that certain Consulting Agreement (herein so called), of even date herewith, by and between Employer and BTM, have been paid in full. For the performance of his services hereunder during each fiscal year of Employer subsequent to fiscal year 1982, Executive shall be entitled to receive a bonus in an amount equal to 38% of the Adjusted Gross Operating Income (hereinafter defined) of Employer. For this purpose, "Adjusted Gross Operating Income" shall mean (i) all revenues of Employer and its consolidated subsidiaries or other controlled entities earned in respect of Employer's business activities and attributable to the fiscal year in question, as determined under the accrual method of accounting minus (ii) the sum of (a) all Operating Expenses (hereinafter defined) of the Employer for the fiscal year in question plus (b) all amounts paid or due to Executive pursuant to Paragraph 3 hereof and all amounts paid or due to Robert B. Blow pursuant to Paragraph 3 of that certain Employment Agreement, of even date herewith, by and between Employer and Robert B. Blow plus (c) all amounts paid to BTM pursuant to the terms of the Consulting Agreement. For purposes hereof "Operating Expenses" shall mean the amounts reflected for the period in question which relate to those categories reflected as "Operating Expenses" on the unaudited "Statement of Operations and Retained Earnings" of Employer for the six month period ending June 30, 1982, and such other expenses as Employer and Employee may hereafter agree should be added to such categories. In the event this Agreement is terminated prior to the last month of Employer's then current fiscal year (unless such fiscal year is 1982), Executive shall be entitled to receive as bonus hereunder for such fiscal year an amount equal to the product of (i)(a) 38% of the Adjusted Gross Operating Income of Employer attributable to such fiscal year of Employer divided by (b) 12, times (ii) the number of calendar months (or portions thereof) in such fiscal year during which this Agreement was in effect. Except as otherwise provided herein, bonuses due to Executive pursuant to this Paragraph 4 with respect to any fiscal year of Employer shall be paid on or before the 60th day following the end of such fiscal year, commencing with the end of Employer's fiscal year first succeeding the Effective Date.

Exhibit 35, ¶ 3.

In March 1984, the defendant Johnson was the president as well as the sole shareholder of the debtor. Desiring to sell his stock in the debtor, Johnson negotiated with Omni Communications, Inc. (Omni), a Tennessee corporation. The negotiations resulted in the execution of an agreement dated March 8, 1984 (the stock purchase agreement). Pursuant to the stock purchase agreement, Omni agreed to purchase Johnson's stock in the debtor. In consideration of Johnson's transfer of the debtor's stock to Omni, Omni agreed, among other things, to pay Johnson the sum of $200,000.00 in cash, to pay Johnson the additional sum of $94,766.53 in cash from the debtor's bank accounts, to release Johnson from liability for a loan to Johnson from the debtor in the amount of $96,739.00, to release Village Travel, a partnership composed of Johnson and his wife, from liability for a loan from the debtor in the amount of $16,694.09 and to assign to Johnson the debtor's interest in a 1983 Lincoln Continental automobile, with Johnson agreeing to assume the liability on any payments due on the automobile.

The proof at trial established that the cash payment of $200,000.00 was in fact

made by Omni to Johnson, but rather than receiving $94,766.53 from the debtor's accounts, Johnson received the sum of $57,611.80, of which $53,171.74 was transferred to Johnson from the debtor's savings account, and $4,440.06 was transferred to Johnson from the debtor's checking account.

Paragraph 6 of the stock purchase agreement (in which "EMJ" refers to Johnson and "J & A" refers to the debtor) states as follows:

EMJ covenants and agrees that all liabilities created by, or for which J & A is obligated, are paid in full through March 1, 1984, with the exception of pending litigation (except that mentioned in paragraph 3 above) and with the exception of disputed accounts payable ("disputed accounts payable" is one for which there is a legal basis to question J & A liability) which shall be addressed by EMJ and Omni with particular creditors on an individual basis. It is the intent of the parties that EMJ will attempt to negotiate, in cooperation with Omni, favorable settlements with creditors with outstanding balances due from, or obligated by, J & A on March 1, 1984. EMJ covenants he will act in good faith with all creditors and protect the good will of J & A and Omni with regard to the business and credit relationships of the two aforestated corporations. It is further excepted from any liability for which EMJ is obligated under this Agreement any liability from the Dun & Bradstreet case, Christian Evangelical Churches of America, the Amburn Case, the Tolbey and Jennings Case, and the Corcoran Case. EMJ waives any right to any proceeds that may be derived by Omni from the aforestated lawsuits. This payment of current liabilities includes payment of all taxes, either known or unknown to J & A as of the date of execution of this Agreement.

## II

The trustee seeks recovery against the defendant upon two theories. First, alleging a fraudulent transfer under § 548 of the Bankruptcy Code the trustee seeks to recover $154,350.80 (consisting of the forgiveness of the defendant's $96,739.00 loan debt to the debtor and the transfer of $57,611.80 in cash pursuant to the terms of the stock purchase agreement). Secondly, the trustee seeks a judgment against the defendant for $81,229.81, the total of certain debts owed by the debtor to various claimants. The trustee contends that paragraph 6 of the stock purchase agreement confers upon the debtor the status of a donee third party beneficiary, entitling the debtor (and thus the trustee, as the holder of the debtor's contract rights) to require the defendant to pay those liabilities of the debtor.

### THE TRUSTEE'S § 548(a)(2) FRAUDULENT TRANSFER CLAIM

Section 548(a)(2) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C.A. § 548(a)(2) (West 1979).

The trustee contends that the forgiveness of the debtor's $96,739.00 loan to the defendant and the transfer of $57,611.80 in cash from the debtor's bank accounts to defendant (as part of Omni's consideration

to defendant for defendant's transfer of his 100% stock ownership in the debtor to Omni) constituted transfers of property of the debtor which were for less than reasonably equivalent value and which resulted in the insolvency of the debtor. Defendant, however, argues that the debtor received reasonably equivalent value for the transfers because the stock purchase transaction ultimately operated to relieve the debtor's obligation to pay defendant his 1983 salary and bonus.

■ The court is persuaded that the defendant gave reasonably equivalent value for the transfers in question only to the extent of $130,814.23. Thus, to the extent that the defendant received more than that value from the debtor, the transfers are avoidable under § 548.

■ The proof demonstrates that by virtue of the March 1984 stock purchase agreement the parties simply worked a novation by which the debtor's obligation to defendant under the employment agreement was discharged by the new undertaking set forth in the stock purchase agreement.

It is generally held that a contract of novation may be effected in three ways: (1) by the substitution of a new obligation between the same parties with intent to extinguish the old obligation; (2) by the substitution of a new obligor in place of the old one, with intent to release the latter; and (3) by the substitution of a new obligee in place of the old one, with intent to transfer the rights of the latter to the former.

58 Am.Jur.2d *Novation* § 3 (1971).

*See also Dickenson v. Speedway Land Co.,* 294 F. 693 (W.D.Tenn.1923). Although

a novation is never presumed, a novation need not be shown by express words, but may be implied from the facts and circumstances attending the transaction and from the conduct of the parties thereafter. 58 Am.Jur.2d *Novation* § 16 (1971); *Central State Bank v. Edwards,* 111 S.W.2d 873, 880 (Tenn.App.1937).

■ Here, the court is satisfied that the totality of the facts and circumstances clearly evidences the parties' intention to discharge the debtor's 1983 salary and bonus obligation (if any) to defendant by the substitution of the undertakings set forth in the stock purchase agreement.[2]

The compensation was not paid during 1983, nor was it paid during the first two months of 1984. Most significantly, it was not paid by the time the defendant relinquished control over the debtor corporation in March. The 1983 corporate tax return, prepared in May *after* the execution of the March stock purchase agreement, showed that the defendant was receiving no compensation for 1983. The court concludes that it was the parties' intent that the March 1984 stock purchase agreement would embody all of what defendant was entitled to and expected to receive from the debtor corporation. The evidence makes clear that the parties did not intend for defendant to have or make any further claims (for 1983 salary and bonus or otherwise) beyond those set forth in the March 1984 agreement.

Defendant insists that he gave reasonably equivalent value because he was entitled to a salary of $100,000.00 and a bonus of $289,103.00 for 1983. However, the court finds that the proof only establishes that defendant was entitled to the $100,-

---

2. In this connection, the court notes that the Restatement (Second) of Contracts distinguishes between a "substituted contract" and a "novation." Section 279 states:
  (1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.
  (2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

Restatement (Second) of Contracts § 279 (1981).
Comment a. to this section notes that "[i]f a substituted contract brings in a new party it is called a 'novation'...."
  Section 280 states: "A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts § 280 (1981).

000.00 salary and does not sufficiently establish defendant's entitlement to a bonus in any amount.

The court is well satisfied that the debtor clearly owed a debt to defendant for $100,000.00 in salary for 1983. The salary provisions of the employment agreement are clear and unequivocal. Neither the defendant nor the debtor took any steps pursuant to the employment agreement to terminate defendant's employment during 1983. The evidence clearly showed that defendant continued to perform full-time during 1983 all of his duties and functions as an executive officer of the debtor corporation. Although the 1983 corporate tax return showed no compensation being paid to defendant for 1983, the court does not believe that this mere fact alone indicates an intention on the part of the debtor and the defendant to alter or cancel defendant's right to compensation under the employment contract. It is unlikely that defendant would have rendered an entire year's service to the debtor with no expectation of compensation.

■ However, the proof does not support a conclusion that defendant was entitled to a bonus for 1983. Defendant's witness, accountant John W. Bacon, testified that defendant was entitled to a bonus for 1983 of $289,103.00. He testified that the agreement entitled defendant to "[t]hirty-eight percent of the operating income, which, as I could determine it, was essentially net income on the financial statement excluding interest income." Transcript of Proceedings at 245 (December 18, 1985). Submitting into evidence what appears to be only the final sheet in a "Working Trial Balance" dated "December 1983," Bacon testified that the "operating income" on December 31, 1983, was $760,797.00. By computing thirty-eight percent (38%) of that figure, Bacon arrived at the $289,103.00 figure quoted above.

This testimony, however, appears to conflict irreconcilably with the debtor's 1983 corporate income tax return. Bacon's "Working Trial Balance" shows that he arrived at his "operating income" figure of $760,797.27 by subtracting $737,096.47 (presumably an expense figure) from $1,498,247.87 (presumably a revenue figure). Yet the 1983 tax return shows a *gross* receipts figure of only $791,441.00. The court cannot reconcile this discrepancy.

The proof simply does not support Bacon's conclusion. First, the tremendous discrepancy between the revenue figures utilized by Bacon and those on the 1983 tax return are unexplained. Secondly, the provision for computing the bonus required the computation to be based on revenue as determined under the accrual method. The proof showed that the debtor booked as accounts receivable the entire amount due on contracts for which the work had not been performed. Further, proof was conspicuously lacking in regard to various elements necessary to compute the "Adjusted Gross Operating Income" under the bonus provisions (i.e. the debtor's 1983 revenues as determined under the accrual method of accounting, the 1983 "Operating Expenses," and "all amounts paid to BTM pursuant to the terms of the Consulting Agreement"). The court notes that the 1983 corporate tax return showed a net tax *loss* of $23,822.00. Finally, the court notes that the total compensation figure claimed by defendant ($389,103.00) is vastly out of proportion to the figures reflected on the 1983 tax return.[3] The proof simply does not support defendant's asserted right to a bonus for 1983.

The court therefore finds that defendant gave reasonably equivalent value (by relinquishing his claims for 1983 salary) to the extent of $100,000.00. Defendant further gave reasonably equivalent value to the extent that the $30,814.23 transferred to him went ultimately to discharge a liability

---

3. In comparison, in 1982 (when defendant received $560,000.00 in compensation) the debtor's gross receipts were $2,130,411.00. Its gross profit was $1,529,936.00. In sharp contrast, in 1983 (for which defendant asserts the right to $389,103.00 in salary and bonus) the debtor's gross receipts, as noted, were only $791,441.00, and its gross profit was only $385,672.00 (an amount *smaller* than the amount of compensation to which defendant claims to be entitled.)

of the debtor.[4] To the extent that defendant received property of the debtor in excess of this amount, the transfers are avoidable. The court finds that defendant received an avoidable fraudulent transfer in the amount of $23,536.57.

Defendant contends that the plaintiff has failed to establish the requisite element of insolvency at the time (or as a result of) the transfers. The Bankruptcy Code defines "insolvent" as follows:

> "[I]nsolvent" means—
>
> (A) with reference to an entity other than a partnership, financial condition such that the sum of each entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>
> (ii) property that may be exempted from property of the estate under section 522 of this title. . . .

11 U.S.C.A. § 101(26) (West 1979).

This is the traditional balance sheet test of insolvency. *Lancaster v. City and County Bank of Washington County (In re Tuggle Pontiac-Buick-GMC, Inc.)*, 31 B.R. 49, 52 (Bankr.E.D.Tenn.1983).

■ The date of the transfers was March 8, 1984. In evidence is a copy of the debtor's 1983 tax return which has been signed by defendant as president of the debtor and John Bacon, the debtor's certified public accountant, under the following declaration: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct and complete." The debtor was on a calendar year for tax purposes and represented on the tax return that it operated under the accrual method of accounting. Under the accrual method of accounting, within the taxable period income is reported when earned, even though not received, and expenses are deducted when incurred, even though not paid. See *Baird v. Commissioner of Internal Revenue*, 256 F.2d 918, 924 (7th Cir.1958).

Included in the tax return is a balance sheet which reflects the financial condition of the debtor as of the end of the tax year, December 31, 1983. This balance sheet shows the following assets and liabilities:

| | Assets | | End of tax year |
|---|---|---|---|
| 1 | Cash | | 43,919 |
| 2 | Trade notes and accounts receivable | 45,005 | |
| | (a) Less allowance for bad debts | | 45,005 |
| 3 | Inventories | | |
| 4 | Federal and State government obligations | | |
| 5 | Other current assets (attach schedule) | | 1,125 |
| 6 | Loans to stockholders | | 113,433 |
| 7 | Mortgage and real estate loans | | |
| 8 | Other investments (attach schedule) | | |
| 9 | Buildings and other depreciable assets | 111,017 | |
| | (a) Less accumulated depreciation | 44,370 | 66,647 |
| 10 | Depleta le assets | | |
| | (a) Less accumulated depletion | | |
| 11 | Land (net of any amortization) | | |
| 12 | Intangible assets (amortizable only) | | |
| | (a) Less accumulated amortization | | |
| 13 | Other assets (attach schedule) | | |
| 14 | Total assets | | 270,129 |

---

4. As noted, the trustee seeks under his fraudulent transfer theory to recover a total of $154,350.80, consisting of the forgiveness of the $96,739.00 loan and the $57,611.80 cash transfer from debtor's bank accounts. However, $30,814.23 of the cash transferred went ultimately to pay debts to First National Bank of Crossville for which the defendant and the debtor were jointly liable. The use of the $30,814.23 to reduce debtor's liability to a third party would clearly constitute reasonably equivalent value for the transfer to the extent that the transaction ultimately operated to confer an economic benefit upon the debtor by discharging the debtor's debt to the third party. *See generally Bailey v. Commerce Federal Savings and Loan Association*, 51 B.R. 61 (Bankr.E.D.Tenn.1985).

|  | End of tax year | | |
| --- | --- | --- | --- |
| **Liabilities and Stockholders' Equity** | | | |
| 15 | Accounts payable | | 44,088 |
| 16 | Mortgages, notes, bonds payable in less than 1 year | | 20,748 |
| 17 | Other current liabilities (attach schedule) | | 109,521 |
| 18 | Loans from stockholders | | |
| 19 | Mortgages, notes, bonds payable in 1 year or more | | 18,398 |
| 20 | Other liabilities (attach schedule) | | |
| 21 | Capital stock: (a) preferred stock | | |
|  | (b) common stock | 1,000 | 1,000 |
| 22 | Paid-in or capital surplus | | |
| 23 | Retained earnings— Appropriated (attach schedule) | | |
| 24 | Retained earnings— Unappropriated | | 76,374 |
| 25 | Less cost of treasury stock | | |
| 26 | Total liabilities and stockholder's equity | | 270,129 |

Exhibit 3, at 4.

**5.** This is the amount of the debtor's checking and savings accounts which were transferred to defendant pursuant to the March 1984 stock purchase agreement with Omni.

**6.** The trustee's witness, accountant Randall Lowe, valued the debtor's accounts receivable at $12,000.00 as of March 8, 1984. However, defendant introduced evidence that between March 10 and the end of the month a little over $25,000.00 was collected on the accounts receivable. Transcript of Proceedings, at 265–266.

Though the face amount of the debtor's accounts receivable at the time of Omni's stock purchase was $1.8 million, Transcript of Proceedings, at 50, the proof showed that many of these so-called accounts receivable actually consisted of the contract amount of contracts which had not yet been performed. Additionally, others of these accounts were involved in litigation disputes. Finally, a portion of the remaining accounts was uncollectible. *See* Testimony of Robert Blow, Transcript of Proceedings, at 263–265. Blow, testified, as noted, that a little over $25,000.00 was collected on the accounts receivable between March 10 and the end of the month. Leon Steinberg, the trustee, testified that efforts to collect accounts receivable have been unsuccessful. Randall Lowe testified that responses to letters sent to confirm accounts receivable elicited responses disputing the amounts owed, indicating work was not autho-

Thus, as of December 31, 1983, the balance sheet showed a net equity of $76,374.00.

The proof supported the following adjustments in the balance sheet to reflect the condition of the debtor at the time of the transfers in question on March 8, 1984:

### Assets

| | |
| --- | --- |
| Cash | 57,611.80 [5] |
| Accounts Receivable | 25,000.00 [6] |

### Liabilities

| | |
| --- | --- |
| Salary payable | 100,000.00 [7] |

Thus, assuming no major changes in the other figures reflected on the December 1983 balance sheet, the adjustments supported by the proof would result in assets of $263,816.80[8] and liabilities increased by $100,000.00 (i.e. to $293,755.00), resulting in a negative net equity. In short, including the debtor's $100,000.00 salary liability to defendant would cause the debtor's liabilities to exceed its assets.

Most significantly, however, it is absolutely clear that at a minimum the transfers to defendant effected by the March

rized, and that money was due back. Based upon the existence of one verified and paid receivable of $750.00 and an additional offer to pay $10,000.00, Lowe assigned the accounts receivable the value of $12,000.00. Transcript of Proceedings, at 178–181.

The totality of the proof does not permit the court to conclude that the clearly inflated "accounts receivable" had a value in excess of the $25,000.00 actually collected in March.

**7.** This figure represents the debtor's $100,000.00 liability to defendant for 1983 salary under the terms of the employment agreement. The liabilities figure on the December 1983 balance sheet did not reflect a liability for either salary or bonus owed to defendant. Transcript of Proceedings, at 168. (The $109,521.00 figure for "[o]ther current liabilities" included only the following: $8,700.00 in accrued wages, $3,200.00 in accrued payroll taxes, $700.00 in franchise and excise taxes, and $90,000.00 in customers' deposits (e.g. payments in advance for work not performed). Transcript of Proceedings, at 67–68.)

**8.** The court notes, however, that the debtor's accountant, John Bacon, testified with respect to "other depreciable assets" that while office equipment had been listed at book value its market value might have been perhaps ten percent higher.

1984 stock purchase agreement (i.e. the transfer of $57,611.80 in cash and the forgiveness of the $96,739.00 in loans to stockholders) would have rendered the debtor indisputably insolvent. The transfers decreased the debtor's assets to some $109,466.00 in the face of liabilities clearly and substantially exceeding that amount.[9]

The court is well satisfied that the trustee has met his burden of proof in establishing that the debtor was either insolvent or was rendered insolvent as a result of the transfers in question.

## THE TRUSTEE'S THIRD PARTY BENEFICIARY CLAIM

In *Eidson v. Hardware Mutual Casualty Co.*, 191 Tenn. 430, 234 S.W.2d 836 (1950) it is said:

'In Tennessee the doctrine is firmly established that the beneficiary, though not a party to the contract, may maintain an action directly in his own name against the promisor, where such promise between the promisor and the promisee is made upon sufficient consideration for the benefit of the third party.'

234 S.W.2d at 840.

Section 302 of the Restatement (Second) of Contracts states:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary. Restatement (Second) of Contracts § 302 (1981).

Section 304 of the Restatement (Second) of Contracts states: "A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty." Restatement (Second) of Contracts § 304 (1981).

■ The court finds that the debtor corporation was an intended, rather than incidental, beneficiary of the defendant's promise in paragraph 6 of the March 1984 stock purchase agreement whereby defendant covenanted "that all liabilities created by, or for which [the debtor] J & A is obligated, are paid in full through March 1, 1984."

In this connection, the court notes that Stanley G. Emert, the president of Omni, testified:

Omni's purpose for obtaining this promise from Mr. Johnson is obvious. Omni, upon acquiring all of the stock of J & A, did not want to acquire ownership of a company burdened with substantial unpaid liabilities, and hence, it was Omni's intention to require, and in fact it did pursuant to the contract, require Mr. Johnson to promise to pay the liabilities

---

9. In addition, the court notes that the proof showed that a $21,000.00 judgment was entered against the debtor in the United States District Court on January 31, 1984. Additionally, rent for January and February 1984 went unpaid in the amount of $2,650.82. Further, the parties' stipulations showed that the debtor incurred various liabilities between December 1983 and March 1984 in the amount of at least $9,590.89. The debtor's obligation on the leased automobile was also apparently due and unpaid. Finally, Randall Lowe testified (based upon his analysis of responses of the debtor's clients to demand letters sent by the trustee in an effort to collect accounts receivable) that his analysis of the debtor's "accounts receiveable" led him to conclude that the debtor's liabilities should be increased by $131,000.00 to reflect amounts due back to clients. Transcript of Proceedings, at 181.

The court notes, too, that during the relevant period disbursements out of debtor's checking account were greatly in excess of deposits. Transcript of Proceedings at 174. The debtor's bookkeeper, Dorothy Vaughan, testified that the defendant instructed her during this period to hold certain bills rather than make payment on them. Further, she testified that sales personnel, whose compensation was a commission based on a percentage of the money received and deposited, were receiving smaller commission checks.

of J & A, except those expressly excepted in paragraph six of the contract. Transcript of Proceedings (December 18, 1985) at 41–42.

Clearly, it may be said that Omni, the promisee, intended to give the debtor the benefit of the promised performance (i.e. the payment of the debtor's liabilities) and that recognition of a right to performance in the debtor is appropriate to effectuate the intention of the parties. Certainly, Omni itself, as the new sole shareholder of the debtor, was benefited by the promise. But that does not detract from the indisputable and obvious fact that the purpose of obtaining the promise was to wipe the slate clean for the *debtor* and to give the *debtor* a clean financial bill of health. This is plainly distinguishable from those facts which have been deemed to constitute one as an incidental, rather than intended, beneficiary of a contract. *Compare* Restatement (Second) of Contracts § 302 comment d (1981) *with* Restatement (Second) of Contracts § 302 comment e (1981).

Having determined that the defendant's promise to Omni to pay the debtor's liabilities may be enforced by the trustee as an intended third party beneficiary, the court will now address the extent of the debts for which the defendant is liable. Those liabilities consist of (1) so-called "trade payables," (2) tax liabilities, and (3) liabilities for breach of contract claims of former clients or customers of the debtor.

The trustee seeks judgment with respect to the following "trade payables":

| Creditor | Amount of Debt |
| --- | --- |
| Thermocopy of Tennessee, Inc. | $ 160.64 |
| Southern Paper Company | 355.10 |
| Eastman Kodak Company | 6,265.44 |
| James R. Ullrich d/b/a Ullrich Printing | 802.84 |
| South Central Bell Telephone Co. | 1,871.58 |
| | $9,455.60 [10] |

In addition, Ellen Louise Parsley of Wood Properties, Inc., managing agent for Regency Properties Limited, testified that the debtor owed $2,650.82 in unpaid rent as of March 1, 1984.

With respect to tax liabilities, the trustee seeks judgment for $802.80 in unemployment compensation taxes owed to the state of Tennessee and $3,556.40 in federal taxes owed to the Internal Revenue Service.[11]

With respect to the liabilities for breach of contract claims, the defendant asserts that his covenant in paragraph 6 of the stock purchase agreement does not include such liabilities. He contends that the scope of paragraph 6 was intended by the parties to be limited only to the payment of trade accounts payable such as those discussed above. The court finds defendant's contention unpersuasive.

The language of paragraph 6 is clear and unequivocal. As noted, it provides that defendant "covenants and agrees that *all* liabilities created by, or for which [the debtor] J & A is obligated, are paid in full through March 1, 1984" (emphasis supplied) with the exception of "pending litigation," "disputed accounts payable," and "any liability from the Dun & Bradstreet case, Christian Evangelical Churches of America, the Amburn Case, the Tolbey and Jennings Case, and the Corcoran Case." None of these specific exceptions apply to the breach of contract claims in question. They were not "pending litigation" on March 1, 1984. They were not "disputed accounts payable." *See Harnischfeger Sales Corporation v. Pickering Lumber Co.*, 97 F.2d 692, 695 (8th Cir.1938) (claim for unliquidated damages for breach of contract not within purview of agreement to assume payment of "accounts payable"). Clearly, they were not within the group of excepted claims explicitly identified by name. Emert's testimony, as noted, made clear that the purpose of paragraph 6, while it would naturally benefit Omni as the new sole shareholder, was "primarily for Johnson & Associates' benefit, for it to

---

**10.** In their "Stipulation of Facts" filed December 18, 1985, the parties stipulated that all of these debts were incurred prior to March 1, 1984.

**11.** The parties also stipulated that these debts were incurred prior to March 1, 1984.

be a clean company, with the exception of stated problems." Transcript of Proceedings, at 59. There is no reason to read defendant's promise to pay "all liabilities ... for which J & A is obligated ... through March 1, 1984" to mean anything other than what it plainly says. The court finds that defendant's liability to debtor under paragraph 6 includes the breach of contract claims in question.

The trustee presented the evidence of a number of individuals who testified by deposition concerning the debtor's breach of its agreement with each of them for the preparation of applications for low power television facilities. With respect to each, the debtor agreed, either in writing or verbally by its authorized "consultants," that the applications would be "acceptable for filing" with the FCC. However, the proof shows that for various reasons (e.g. engineering deficiencies, unauthorized interference with existing facilities, and FCC's "freeze" on acceptance of low power television applications) a number of applications were deemed by the FCC to be not acceptable for filing. To the extent that the applications were rejected as unacceptable for filing, these claimants have breach of contract claims against the debtor which arose before March 1, 1984.

Daniel Lamaute paid the debtor $7,500.00 for four applications, one of which was accepted by the FCC, with the remaining three being returned by the FCC as unacceptable for filing. Determining the cost of each application to be $1,875.00, the trustee asserts that the debtor's liability to Lamaute is $5,625.00. The trustee seeks recovery in that amount from defendant.[12]

John Wyatt Emmerich, president of Commonwealth Venture Systems, Inc., testified that his company paid the debtor $12,000.00 for nine applications for facilities in McComb, Mississippi. Six were rejected by the FCC as unacceptable for filing. Determining the cost of each application to be $1,333.33, the trustee asserts that the debtor's liability to Commonwealth Venture Systems, Inc. is $7,999.98. He seeks that amount from defendant.

Daniel A. Dwelle, president of Community Information Center, Inc., testified that his company paid $4,000.00 for an application which was returned by the FCC as unacceptable for filing. While the debtor attempted to rectify the problem, the application was never granted. The trustee asserts that the debtor's liability to this claimant is $4,000.00, the amount appearing on the claimant's proof of claim. The trustee seeks to recover that amount from defendant.

Carter White, president of Meriden Record Company, testified that his company paid the debtor $7,000.00 for the filing of two applications. Neither of these were accepted by the FCC because of a "freeze" then in effect on the filing of low power television applications. The trustee asserts that the debtor's liability to Meriden is $7,000.00 (the amount of its proof of claim) and seeks recovery from the defendant in that amount.

Theodore Everett Larimer, president of Larimer Publications, Inc., testified that in 1981 his company paid the debtor $4,500.00 for three applications. The FCC determined that two of the applications were not acceptable for filing. Mr. Larimer has heard nothing from the FCC with respect

12. The court notes that the amounts which the trustee asserts are owing from the debtor to certain of these claimants is less than the amounts claimed on their respective proofs of claim filed in the debtor's bankruptcy case. For example, Lamaute's proof of claim is for $7,000.00. In granting judgment against the defendant in the amount for which the trustee has sued, this court is not making any determination as to extent of the allowability of this or any of the breach of contract claim. Under § 502 of the Bankruptcy Code "[a] claim ...

proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects." 11 U.S.C.A. § 502(a) (West 1979). The court merely finds that the trustee has established the debtor's liability to these claimants in at least the amounts which he asserts are owing to these claimants and which he seeks to recover from defendant. Absent proper objection to the claims, however, the court makes no adjudication here as to the allowability or nonallowability of any of these claims.

to the third application. Although Larimer's contract provided for the payment of $9,000.00 ($4,500.00 in cash and the balance of $4,500.00 in eighteen months) Larimer did not pay the balance because he felt that he never received anything of value for his initial investment of $4,500.00. The trustee asserts that the debtor's liability to Larimer is $4,500.00, the amount of its proof of claim, and seeks recovery from defendant in that amount.

Sandra M. Shenfield, owner of Atlantic County Television, Inc., testified that her company paid the debtor $14,000.00 for the filing of six applications in Atlantic City, New Jersey. All were rejected by the FCC as unacceptable for filing on the basis of unwarranted interference with other facilities. The trustee asserts the debtor's liability to Atlantic to be $14,000.00, and he seeks recovery from the defendant in that amount.

George Bruno, managing partner of Mountain Wave Media, a partnership, testified that his partnership paid the debtor $12,000.00 pursuant to a letter agreement dated September 20, 1982, for the preparation of four applications, to be submitted within three weeks. *See* Exhibit 1 to Mr. Bruno's deposition. The debtor submitted and resubmitted applications, all of which were unacceptable to the FCC, with the exception of the application for one location, which as of January 1985 was still pending. Determining the cost of each application to be $3,000.00, the trustee asserts debtor's liability to Mountain View Media to be $9,000.00 and seeks recovery from defendant in that amount.

■ In addition to the foregoing breach of contract claims by clients, there are several other breach of contract claims. David Becker, Senior Liabilities Claim Supervisor of Illinois Employers Insurance of Wausau (hereinafter "Illinois Wausau"), testified with respect to the debtor's liability in the amount of $1,000.00 for the deductible pursuant to a professional errors and omissions liability policy in which Illinois Wausau was the insuror and the debtor was the insured. The term of the policy

was December 13, 1982, to December 13, 1983, with a deductible of $1,000.00. The insuring provisions of the policy provided that the insured would reimburse the insuror any sum, not to exceed the deductible, expended by the insuror in the defense of a claim. A claim was made against the debtor during the policy period, and Illinois Wausau referred the defense thereof to Butler, Vines, Babb & Threadgill, a Knoxville law firm. In connection with its defense of the debtor, Butler, Vines, Babb & Threadgill submitted to Illinois Wausau a statement in the amount of $1,905.43, which was paid by Illinois Wausau on November 10, 1983. While demand for payment was not made by Illinois Wausau until April 1984, the court nevertheless finds that the Illinois Wausau claim constituted a liability of debtor as of March 1, 1984, and as such, defendant is liable therefor.

In paragraph 3(h) of the stock purchase agreement, Omni agreed to assign to defendant the debtor's interest in a 1983 Lincoln Continental automobile, and defendant agreed to assume the liability for any payments due on the automobile. In 1981 the debtor entered into a "Vehicle Lease Agreement" (dated December 18, 1981) leasing to debtor a 1981 Cadillac for a term from December 20, 1981, to December 18, 1984. Subsequently, the lease agreement was modified by a "Modification, Renewal and Extension Agreement" and an agreement designated as a "Substitution of Collateral Agreement." By these two latter agreements the 1983 Lincoln was substituted for the 1981 Cadillac, and the amount of payments was increased.

The Federal Deposit Insurance Corporation, as successor to the lessor City and County Bank of Knox County, has filed a proof of claim in the debtor's bankruptcy case for unpaid payments under the lease and its modifications. The trustee seeks to recover the amount of that liability from defendant pursuant to defendant's agreement with Omni to assume the liability for payments due under the lease.

Joe Love, an employee of the FDIC, testified that the FDIC repossessed the car on July 13, 1985, in Las Vegas, Nevada. This was after the lease had expired on November 20, 1984. The FDIC bases its claim on paragraph 11 of the original lease agreement which provides that the lessor is entitled in the event of default to recover any unpaid rental payments. Love testified that, of the total $22,197.84 in rental payments required under the lease, $11,343.08 had been paid, leaving a balance due of $10,854.76. Adding to that amount repossession costs of $1,234.45 (and giving credit for a $450.00 security deposit) Love testified that FDIC was entitled to $11,639.21 owing under the lease. Although the FDIC subsequently sold the 1983 Lincoln for $11,300.00, Love testified that the FDIC did not credit the sale proceeds against the unpaid rent balance. (Paragraph 11 of the original lease agreement provides that in the event of default the lessor may retain resale proceeds and still recover any unpaid monthly rentals.)

The court finds that the trustee is entitled to assert the debtor's rights as a third party beneficiary (of the defendant's promise to Omni to assume liability on the payments due on the lease). Thus, the trustee may recover from defendant the amount of the debtor's liability under the lease.

As noted, paragraph 11 of the lease agreement provides that the lessor may recover unpaid rental payments without giving the lessee credit for any proceeds of resale. The court finds that the trustee may recover from defendant the $11,639.21 which the FDIC asserts is due from the debtor under the lease.

In accordance with the above, then, the court finds that the defendant is liable to the trustee in the amount of $81,229.81, consisting of $12,106.42 in liabilities for trade accounts payable, $4,359.20 in tax liabilities, $52,124.98 in liabilities for breach of contract claims, $1,000.00 for the Illinois Wausau claim, and $11,639.21 for the unpaid automobile lease payments.

The court may take judicial notice of the debtor's bankruptcy file, including the claims filed therein. *See Citizens Bank v. Leach (In re Leach)*, 35 B.R. 100, 101–02 (Bankr.W.D.Ky.1983); *Armstrong v. General Growth Development Corp. (In re Clothes, Inc.)*, 45 B.R. 419, 421 (Bankr.D.N.D.1984); *Universal Clearing House Company v. Accounting Services Company (In re Independent Clearing House Company)*, 41 B.R. 985, 1013 (Bankr.D.Utah 1984); *United Missouri Bank v. Abernathy (In re Abernathy)*, 38 B.R. 769, 771 (W.D.Mo.1984). Upon so doing, the court notes that proofs of claim have been filed for the aforedescribed trade payables, taxes and breach of contract claims.

Defendant claims failure of consideration with respect to his agreement to pay the liabilities of the debtor in that Omni borrowed from First National Bank of Crossville the $200,000.00 cash payment it made to defendant pursuant to the stock purchase agreement, and defendant was required by the bank to personally guarantee Omni's loan and secure his personal guarantee with a certificate of deposit in the amount of $200,000.00. Upon Omni's subsequent default, the bank charged defendant's certificate of deposit for the collection of the note. Defendant contends that, because he had to make good on the guarantee, he received nothing for his agreement to assume liabilities, and therefore, the agreement to pay liabilities fails for lack of consideration. The court finds this argument to be unpersuasive. Defendant's guarantee of Omni's loan from the bank is a matter outside the scope of the stock purchase agreement, and the fact that he had to make good on his guarantee does not cause the stock purchase agreement to fail for lack of consideration. The fact that he chose to contract with the bank outside of the stock purchase agreement cannot defeat the validity of the stock purchase agreement. Clearly, there was sufficient consideration in the stock purchase agreement to support Johnson's agreement to assume liabilities. "The fact that the consideration for a contract subsequently diminishes in value or becomes of no value

at all does not relieve the promisor from liability on his promise." 17 C.J.S. *Contracts* § 131 (1963). Defendant's asserted defense is not well taken.

In conclusion, the court finds transfer of debtor's cash to the defendant avoidable under § 548 to the extent of $23,536.57. The court further finds defendant liable in the amount of $81,229.81 to the trustee as a third party beneficiary of defendant's undertaking under paragraph 6 of the stock purchase agreement.

Judgment for the plaintiff trustee will be entered accordingly.[13]

In accordance with Bankruptcy Rule 7052, this memorandum constitutes findings of fact and conclusions of law.

---

13. The parties have consented to this court's entry of a final judgment with respect to the adjudication of the trustee's third party benefi-

ciary contract claim against defendant. 28 U.S. C.A. § 157(c)(2) (West Supp.1986).