In re SOUTHERN INDUSTRIAL
BANKING CORPORATION,
d/b/a Daveco, Debtor.

Thomas E. DuVOISIN, Liquidating
Trustee, Plaintiff,

v.

Hugh G. and Hazel ANDERSON, et
al., Defendants.

Bankruptcy No. 3–83–00372.

United States Bankruptcy Court,
E.D. Tennessee.

March 2, 1987.

See also, 6th Cir., 809 F.2d 329.

352 

Table of Contents

| | | Page |
|------|------------------|------|
| I. | Introduction | 354 |
| II. | Bankruptcy filing | 355 |

| | | Page |
|---|---|---|
| III. | Bankruptcy definition of insolvency | 356 |
| IV. | Parties' respective positions | 357 |
| V. | Jesse Barr's overview of Butcher banking system | 357 |
| VI. | Internal balance sheets and bankruptcy schedules | 359 |
| VII. | Forged and fictitious loans | 359 |
| VIII. | Commercial loans generally | 360 |
| | (A) FDIC examination and analysis | 360 |
| | (B) Arthur Andersen examination and analysis | 362 |
| | (C) Liquidating trustee's examination and analysis | 366 |
| | (1) Related parties | 366 |
| | (2) Violation of ten percent limitation | 367 |
| | (3) Bankrupt borrowers | 367 |
| | (4) Other FDIC examinations | 367 |
| | (D) KMG Main-Hurdman's examination and analysis | 368 |
| IX. | KMG Main-Hurdman, other conclusions | 369 |
| | (A) Installment loan interest | 369 |
| | (B) Installment loan loss reserve | 371 |
| | (C) Loan fees and insurance commissions | 371 |
| | (D) Sale/lease-back transactions | 372 |
| | (1) Merchants Road property | 372 |
| | (2) Morristown property | 373 |
| | (E) Preferred stock transaction | 373 |
| | (F) ESOP transaction | 374 |
| X. | Income tax returns | 374 |
| XI. | Trustee's applications | 375 |
| XII. | Conclusion | 376 |

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff in these consolidated preference actions, 11 U.S.C.A. § 547 (West 1979), is the liquidating trustee of a trust established under the modified plan of reorganization confirmed by the court in the Southern Industrial Banking Corporation ("SIBC") case. Defendants, former holders of investment certificates sold by SIBC, received full or partial payment on their investment certificates within the 90–day period preceding the filing of the SIBC bankruptcy petition—December 10, 1982—March 10, 1983. Plaintiff now seeks to avoid these transfers as preferences. 11 U.S.C.A. § 547(b) (West 1979).

These are adversary proceedings arising under Title 11 of the United States Code. Pursuant to 28 U.S.C.A. § 1334(b) (West Supp.1986), the district courts have jurisdiction over all cases arising under Title 11. By order dated January 16, 1986, the United States District Court for the Eastern District of Tennessee referred these adversary proceedings to this court. 28 U.S.C.A. § 157 (West Supp.1986).[1] These are core proceedings as defined in 28 U.S.C.A. § 157(b)(2)(F) (West Supp.1986), and pursuant to 28 U.S.C.A. § 157(b)(1) (West Supp. 1986). This court may hear and determine

---

1. Pursuant to orders of general reference, this case was referred to the bankruptcy court when originally filed on March 10, 1983. On September 23, 1985, upon the motion of certain defendants, the district court withdrew the reference of the consolidated preference proceedings to this court but on January 16, 1986, re-referred the proceedings. Prior to the withdrawal of the consolidated preference actions, the issue of insolvency had been set for trial by this court for September 27, 1985.

all core proceedings arising in a case under Title 11 referred under 28 U.S.C.A. § 157(a) (West Supp.1986), and may also enter appropriate orders and judgments.[2]

## I

### Introduction

Southern Industrial Banking Corporation ("SIBC") was a Tennessee industrial loan and thrift company which was originally chartered in 1929. SIBC was permitted by law under a "grandfather" clause to operate under the name "Southern Industrial Banking Corporation," even though other industrial loan and thrift companies were prohibited by law from using the word "bank" or "banking" in their name. In late 1982 and early 1983 SIBC was the only industrial loan and thrift company in Tennessee using the word "banking" in its name.

The business of SIBC consisted of making loans to individuals and entities. The types of loans that SIBC made generally fell into two categories, the first category being installment loans. These were loans made directly to individuals or entities or indirectly through the purchase of installment loan contracts from dealers, such as appliance and furniture stores, for the purpose of financing the purchase of consumer products. Other significant attributes distinguishing the installment loans made by SIBC from loans made by banks and savings and loan associations (but not by other industrial loan and thrift corporations) are the following:

(1) Interest rates on installment loans were generally higher than interest rates that could be earned by commercial banks, savings and loans, and other federally insured and regulated financial institutions. Also, all interest due was precomputed and added to the face amount of the note.

(2) In addition to interest, SIBC was permitted to charge a 4% loan origination fee designed to recover the administrative costs of processing, approving, funding, and setting up the loan on the books of the lending company. The loan origination fee was precomputed and added to the face amount of the note.

(3) A late fee of up to 5% per each late installment could be charged.

(4) Each installment loan was for a specific term with the total loan balance (including principal, interest, loan origination fee, and insurance premiums) payable in equal monthly installments. There was no breakdown as to how the monthly payment by the borrower was to be applied against the particular components of the loan payment.

(5) Installment loans were generally secured by a pledge of a security interest by the borrower in consumer goods owned or being purchased.

(6) The average term of an installment loan was 24 to 29 months. Many loans were paid off early by the borrower either by direct payment or by refinancing the loan.

(7) Credit life insurance was offered and usually purchased by the borrower. The premiums for the credit life insurance, including commissions payable to the lender from the sale of the credit life policy, were added to the face amount of the loan.

(8) Special rules applied to the refunding or rebate of interest, insurance premiums, and loan fees charged with respect to installment loans.

(9) Interest was rebated based on a formula established under state law.

The second aspect of SIBC's business was the making of commercial loans to individuals and entities. Unlike installment loans, commercial loans were simple interest loans.

The most important source of funds for SIBC was money received through the sale of investment certificates and passbook accounts which were, unfortunately, remarkably similar to certificates of deposit and passbook savings accounts offered by commercial banks and savings and loan institu-

---

2. The ten-day trial in these proceedings commenced on January 12, 1987. Twenty-two attorneys representing 596 defendants and five pro-

se defendants appeared on the first day of trial. Thereafter, eight attorneys attended all trial days.

tions. SIBC was one of four or five out of four hundred industrial loan and thrift companies in Tennessee which actively pursued the sale of these types of accounts as a source of capital. The principal difference between the accounts offered by SIBC and those offered by commercial banks and savings and loan institutions was that the certificates and accounts sold by SIBC were *not* federally insured. The SIBC certificates contained the caution—"NOT FEDERALLY INSURED." In addition, they generally earned a higher rate of interest than similar accounts at commercial banks and savings and loans.[3]

In late 1982 and early 1983, SIBC operated nine separate branches located in six counties in East Tennessee, including Knox, Anderson, Hamblen, Blount, Union, and Hawkins Counties. Unlike institutions organized under state banking laws, there were no regulations limiting industrial loan and thrift companies from opening and operating branches across county lines.

SIBC regularly prepared, in the normal course of business, monthly internal balance sheets and profit and loss statements. In addition, SIBC also retained a certified public accountant to audit its year-end financial statements and render an opinion as to whether its financial statements accurately presented the financial condition and results of operation for the appropriate period. Beginning with the year ending December 31, 1979, SIBC's audit was performed by Camper & Company (formerly Camper, Henderson & Company), a certified public accounting firm located in Memphis, Tennessee. The audited financial statements of SIBC for the periods ending December 31, 1980, and December 31, 1981, reflect that SIBC had a positive net worth at the end of each of these periods as follows:

| Year | Net Worth |
|------|-----------|
| 1980 | $1,288,924 |
| 1981 | $3,102,065 |

Camper & Company issued unqualified opinions for these years to the effect that the financial statements fairly presented the financial condition and operations of SIBC.[4]

The internal financial statements of SIBC were prepared by and under the direction of Ms. Pat Smithson, who was employed as head bookkeeper by SIBC. These financial statements were reviewed by James Steiner, president of SIBC.

## II

### *Bankruptcy Filing*

On March 10, 1983, SIBC filed a chapter 11 bankruptcy petition. SIBC operated as a debtor in possession only until April 18, 1983, when this court ordered the appointment of a trustee due to gross mismanagement of SIBC's affairs. 11 U.S.C.A. § 1104(a)(1) (West 1979). On April 19, 1983, the court appointed Irwin Deutscher as trustee. On November 28, 1983, the court confirmed a modified plan of reorganization (proposed by trustee Deutscher) conditioned upon the occurrence of certain contingencies. These contingencies were either satisfied or waived, and the court entered an order of confirmation effective January 20, 1984.

Pursuant to Order No. 92, entered January 20, 1984, the court appointed plaintiff Thomas E. DuVoisin as the liquidating trustee of the Creditors' Liquidating Trust created under the SIBC plan for reorganization. Claims based on preferential transfers are assets of the Creditors' Liquidating Trust. In accordance with his duties as liquidating trustee, between May 21, 1984, and April 19, 1985, plaintiff filed more than nine hundred (900) adversary proceedings

---

**3.** Four depositors testified by deposition that they chose SIBC because of higher interest rates.

**4.** Defendants attempted to introduce a purported financial statement for the year ending December 31, 1982, through the testimony of Mr. Booker Camper. Mr. Camper testified he com-

menced an audit of SIBC in August 1982 but never completed the audit because his work papers were stolen; further, that he had never seen, much less signed, the purported financial statement. For these reasons, the court denied the introduction of defendants' exhibit 55, the alleged 1982 financial statement.

seeking to recover alleged preferences from SIBC investors who cashed their investment certificates, both prior to and upon maturity, within the 90–day period preceding the filing of the bankruptcy petition. On May 23, 1985, pursuant to Bankruptcy Rule 7042, the court consolidated these adversary proceedings.

In a Memorandum filed September 26, 1986, 66 B.R. 349 (Bankr.E.D.Tenn.), on the Liquidating Trustee's Motions for Partial Summary Judgment, this court held: (1) that the court has jurisdiction to adjudicate the consolidated preference actions; (2) that 28 U.S.C.A. § 157(b)(2)(F) (West Supp. 1986) is not unconstitutional; (3) that extension of the term of service of the bankruptcy judges by the Bankruptcy Amendments and Federal Judgeship Act of 1984 does not violate the Appointments Clause of the United States Constitution; (4) that SIBC was eligible for relief as a debtor in bankruptcy, 11 U.S.C.A. § 109 (West 1979 and Supp.1986); [5] (5) that plaintiff's claims are not barred due to either lack of formal notice to defendants of the SIBC bankruptcy proceedings or alleged prepetition fraud; (6) that plaintiff has standing to pursue these preference actions and the recovery, if any, will properly benefit unsecured creditors; (7) that neither laches nor waiver is a defense to plaintiff's claims; and (8) that pursuance of, these preference actions is not contrary to the terms of the confirmed plan of reorganization.

Plaintiff's request for summary judgment on the § 547(b)(5) element (greater percentage) was denied. His request for summary judgment on the issue of insolvency, 11 U.S.C.A. § 547(b)(3), had previously been denied.[6]

The sole issue before the court at this time is whether the defendants received the challenged transfers while the debtor was insolvent. 11 U.S.C.A. § 547(b)(3) (West 1979).

### III

*Bankruptcy Definition of Insolvency*

The statutory element of insolvency is a Bankruptcy Code defined term. 11 U.S.C.A. § 101(29) (West Supp.1986). In pertinent part, § 101(29) defines insolvency as:

(A) With reference to any entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) [exempt property under § 522].

In applying the Bankruptcy Code definition of insolvency, the court must make a factual finding as to whether assets at fair valuation exceed debts. This is known as the balance sheet test of insolvency. *Steinberg v. Johnson (In re Edward M. Johnson & Associates, Inc.)*, 61 B.R. 801, 808 (Bankr.E.D.Tenn.1986); *Parlon v. Claiborne (In re Kaylor Equipment and Rental, Inc.)*, 56 B.R. 58, 61 (Bankr.E.D.Tenn.1985); *Lancaster v. City & County Bank of Washington County (In re Tuggle Pontiac-Buick-GMC, Inc.)*, 31 B.R. 49 (Bankr.E.D.Tenn.1983).

In applying the balance sheet test of insolvency required by § 101(29), the focus is one of valuation of assets; in other words, what is meant by "fair valuation"? Fair valuation does not mean historical value, *In re Kaylor Equipment, supra,* nor does fair valuation refer to the value of assets in the worst circumstances or in the best circumstances, *Jahn v. Reading Body Works (In re A. Fassnacht and Sons, Inc.)*, 45 B.R. 209, 217 (Bankr.E.D.Tenn.

---

5. In the district court some but not all defendants argued that SIBC was not eligible to be a debtor in bankruptcy because it was a "bank," "industrial bank," or "similar institution." Disagreeing, the district court concluded SIBC was not a "bank" within the scope of § 109(b)(2) and that under either the state classification test or the independent classification test SIBC was eligible to be a debtor in bankruptcy. *DuVoisin*

v. Anderson (In re Southern Industrial Banking Corp.)*, 59 B.R. 978, 986 (E.D.Tenn.1986).

6. *DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 72 B.R. 183. Consolidated Adversary Proceedings, Memorandum and Order (Bankr.E.D.Tenn.1986).

1984). Instead, fair valuation is measured by a hypothetical liquidation of debtor's assets over a reasonable period of time. *Waldschmidt v. Ranier (In re Fulghum Construction Company)*, 7 B.R. 629, 632–33 (Bankr.M.D.Tenn.1980) ("[T]he reasonable estimate of what can be realized from the assets by converting them into, or reducing them to, cash under carefully guarded, if not ideal, conditions.... [A] value that can be made available for payment of debts within a reasonable period of time.").

## IV

### *Parties' Respective Positions*

Plaintiff submits the facts in this case are complicated—

> They are complicated because SIBC held itself out for a long period of time as a solvent institution. It did so "with mirrors." Its "mirrors" were deceptive and manipulative accounting practices, and a virtually worthless commercial loan portfolio.

> However, when the mirrors are taken away and SIBC is realistically examined, the critical fact is crystal clear: SIBC was massively insolvent during the 90–day preference period relevant to these proceedings.

Plaintiff's Trial Brief at 1.

Defendants concede that at some point in time SIBC became insolvent. They insist, however, that the debtor was not insolvent during the preference period; further, that the plaintiff may not retroject the insolvent condition as shown by the debtor's bankruptcy schedules back through the 90–day preference period. Defendants insist retrojection is not permissible because the financial condition of the debtor did in fact change substantially during the interim period between December 10, 1982, the beginning of the preference period, and March 10, 1983, the date of SIBC's filing a voluntary bankruptcy petition.[7] Defendants insist further that SIBC's schedules are incomplete and may not be accurate. They also insist that certain related events so substantially affected the debtor's financial condition as to render the debtor's schedules an unreliable indicator of its financial condition throughout the 90–day preference period. Specifically, they refer to (1) the failure of the United American Bank ("UAB") on February 14, 1983; (2) the "run" on SIBC precipitated by the UAB failure; (3) withdrawals by debtor's "depositors and/or investors"; (4) the failure of the debtor during and after February 1983 to effect proper measures to maintain the integrity of its books and records as evidenced by (a) the unexplained disappearance of $12.2 million of commercial loan files, (b) the unexplained appearance of $6.4 million of commercial loan files, and (c) an inability to determine whether an alleged $5.5 million contribution by C.H. Butcher, Jr., constituted an additional capital contribution or the purchase of additional commercial loans; and (5) the failure of the debtor in its schedules to list all assets at fair market value rather than book value.

Additionally, defendants assert that the debtor's schedules fail to reflect the value of SIBC's intangible assets, such as good will, the use of the word "banking" in its name, going concern value, and claims against management, borrowers, and others.

Defendants contend that plaintiff and his expert witnesses failed to inquire into SIBC's liabilities. Such a failure, they maintain, renders their finding of insolvency incomplete and therefore worthless. However, the amount of liabilities was never an issue, and in the best of cases it is impossible to imagine that the schedules of SIBC overstated its liabilities. It is more probable that the schedules understated SIBC's liabilities, and would have to be adjusted accordingly.

## V

### *Jesse Barr's Overview of Butcher Banking System*

Jesse Barr played a major role in the rise and fall of the Butcher banking empire.

---

**7.** As will be seen hereafter, SIBC's bankruptcy schedules show that its liabilities exceeded its assets by $2,411,513.41 as of March 10, 1983.

From 1961 until 1975 Barr was employed at the Union Planters Bank in Memphis. In 1975 he left Union Planters to work for Jake and C.H. Butcher, Jr. After leaving Union Planters, Barr was charged with misapplication of funds from that bank and served 13 months of a 5–year prison sentence in a federal correctional institution. In 1978, Union Planters obtained a $14 million civil judgment against him. Union Planters has collected no money on the judgment. In January 1979, after leaving the federal institution, Barr returned to work for the Butchers. In 1984 he was indicted in the Eastern District of Tennessee for bank fraud and later pled guilty. He is presently serving an 18–year sentence in the Federal Correctional Institution in Lexington, Kentucky.

Barr worked primarily for Jake Butcher, president of the United American Banks, and a brother of C.H. Butcher, Jr. Barr was president of both JFB Petroleum & Land Company and Service and Management Company, two of Jake Butcher's holding companies. Barr "ran" the companies. JFB Petroleum owned: Valley Machinery, Valley Management, Natural and Energy Mining Company, Bull Run Oil Company, Church Petroleum Marketeers, and Deere Acres, all Butcher companies. JFB Petroleum was the parent company, a vehicle that Jake Butcher used to run his other companies. Butcher borrowed from SIBC and UAB and other Butcher related banks. According to Barr, Butcher borrowed "anywhere he wanted to, however he wanted to, in whatever name he wanted to." The money would usually go into Butcher's bank account and would then be transferred from that account to other accounts. No notes were exchanged, only bookkeeping entries made.

Barr testified that Jake Butcher did not borrow from SIBC "a whole lot" until the latter days of 1982. SIBC was "just too small" even to use until the latter stages of the Butcher debacle, and the only reason it was used then was because the Federal Deposit Insurance Corporation ("FDIC")

examiners were in all other Butcher banks. Jake borrowed three or four times from SIBC during the month of December 1982.

In the fall of 1982, Barr moved $16 million in loans on behalf of Jake Butcher from UAB to SIBC. He gives two reasons: (1) SIBC had just gone through a "massive fund raising time" and had been more successful than anticipated,[8] but was paying out more than it was earning, resulting in a "negative spread"; and (2) Butcher needed to move some loans from UAB for liquidity reasons. Jake and C.H. Butcher, Jr. asked Barr to expedite the moving of the loans from UAB to SIBC. He did so. Later, UAB repurchased the loans from SIBC.

Barr detailed how the FDIC examiners descended on all Butcher banks on November 1, 1982. Thereafter, no loans could be "moved."

According to Barr, in 1981 Jake Butcher's interest payments and lifestyle expenses ran $300,000.00 to $500,000.00 a month. By 1982 this amount was close to $2 million a month. After November 1982, he borrowed from SIBC to pay other loans and to pay interest.

Judy Franklin, Jake Butcher's secretary, kept blank SIBC notes at her office. Whenever Jake Butcher needed to borrow money at SIBC, "she'd pull one out." She also kept blank notes for use at all United American and C & C Banks.

Barr testified that some loans that were criticized by the examiners at the C & C Banks were moved to SIBC. Some were "backdated" to indicate they were current.

Barr summarizes the operation of the Butcher banking empire and his remorse at being a participant therein—

I admit there's fraud, there's dishonesty, there's deceit, there's forgery involved in this whole deal and I've admitted on the stand that I was a party to it. Don't make me proud of myself. The one thing that I feel the worst about in this whole damn deal is the people that,

---

**8.** By advertising the payment of high interest rates, SIBC was able to attract considerable funds.

the depositors at Southern Industrial. And I'm very sincere about that. I didn't have a thing to do with the running of Southern Industrial and I do feel very badly about it. If I could have corrected that one situation, I would go back and try to do that. But I can't change that. I'm just sorry that it happened. I'd like to change a lot of things but I can't.

Deposition of Jesse Barr, August 29, 1986, at 144.

## VI

### Internal Balance Sheets and Bankruptcy Schedules

SIBC's internal balance sheets are not reliable evidence of its solvency during the preference period. This fact is conceded by all parties. Ms. Smithson, who prepared them, testified they were "untrustworthy." The court agrees. The FDIC examiners found SIBC's record keeping to be "extremely disorganized," with source documents missing in many instances. Numerous accounts were out of balance and could not be reconciled. Substantial adjustments therefore must be made to reflect SIBC's true financial condition.

SIBC's bankruptcy schedules filed March 23, 1983, show that SIBC's liabilities exceeded its assets by over $2.4 million as of March 10, 1983. However, the accuracy of these documents is questionable because they are based on SIBC's own internal balance sheets, previously found by this court to be untrustworthy. Therefore, adjustments must likewise be made in the bankruptcy schedules to reflect SIBC's true net worth.

9. Hereafter, plaintiff's exhibits will be reflected as Px and defendants' exhibits as Dx.

10. Px 12G appears to be inconsistent with Px 12E. Px 12G reflects the total amount of fictitious loans to be $4,739,328.78, while Px 12E reflects the total amount to be $6,436,822.45. The amount for some loans varies approximately $1,000.00, and some loans listed on Px 12E are not reflected on Px 12G. The court assumes that the individual differences can be attributed to accrued interest between the dates reflected in each document. It is not necessary to deal with the inconsistency of the Panama properties

## VII

### Forged and Fictitious Loans

SIBC's bankruptcy schedules list as assets $31,370,290.37 in commercial loans. These alleged loans include $4,106,724.67 in forged loans. (Px 12G and Px 2A–2S.[9]) The purported makers of these notes neither signed their names, authorized anyone to sign their names, nor received any proceeds or benefits therefrom. The schedule also included $4,739,328.78 (Px 12G) in fictitious loans.[10] Using the 11 U.S.C.A. § 101(29) (West Supp.1986) definition of insolvency, neither forged nor fictitious loans can be considered as assets of the debtor.

However, many of the fraudulent loans were actually funded and the proceeds went to parties other than the alleged makers. It is contended by the defendants that, *if* the true signatory can be identified and the proceeds traced to him, a legal recovery can be had for those proceeds. Defendants insist that any such cause of action has value as an asset. Evidence regarding the person(s) receiving the proceeds of some of these loans is as follows:

1) Alchemist Investments note for $153,550.56. Proceeds to West Knoxville Investment Company.

2) Bill Deathridge note for $84,083.98. Proceeds to C.H. Butcher, Jr. and David Crabtree.

3) Nine (9) separate notes to Equity Investors, Ltd. and Investors Associates Ltd. for $292,664.14 each. Proceeds to C.H. Butcher, Jr. Two of these notes were identified in the $7.8 million loan sale to C.H. Butcher, Jr. in February 1983.[11]

loan listed on Px 12E, but not Px 12G, as it is not included in the final figure of $4,739,328.78 found by the court. The court finds this loan was sold to C.H. Butcher, Jr. in the sale of commercial loans totaling $7.8 million in February 1983.

11. The final forged note upon which funds were disbursed was to Gary Long in the amount of $20,690.20. The proceeds went to C & C Bank to purchase stock. An action to recover these proceeds against Long was unsuccessful. See *Deutscher v. Long, (In re Southern Industrial*

Although evidence was adduced that David Crabtree had a propensity to sign others' names to documents such as notes,[12] there is no evidence regarding who actually signed these notes nor the prospects of any possible recovery against such person(s). It is undisputed that C.H. Butcher, Jr., and David Crabtree, who received the proceeds from some of the notes, are both in bankruptcy. The court has no choice but to value any such tenuous possibility of recovery against these bankrupt individuals or their entities at zero, or nominal at best.[13]

With regard to the fictitious loans, sometime after February 1983 and before March 9 of the same year, the loan files pertaining to 41 loans in the aggregate amount of $12,255,657.43 on the books of SIBC disappeared. (Px 12E.) The fate of these loan files is unknown, but it is clear that some documents of SIBC were shredded in early 1983.

During the same period of time new files were manufactured for commercial loans that were never made. SIBC listed these loans as assets on its bankruptcy schedules totaling $6,436,822.45, even though no disbursements were made. It is submitted by the plaintiff that the fictitious loans totaling $6.4 million, the sale of unidentified commercial loans to Lewis S. Howard, Trustee, in the amount of $5.5 million, and the sale to C.H. Butcher, Jr. of two loans totaling $589,755.00 are the sloppy attempt to cover up the discrepancy created by the $12,255,657.43 in missing loans.

The court presumes such facts to be true, as there is no other logical reason presented as to why bogus loan files would be created. By any standard, a fictitious uncollectable loan should not remain on the balance sheet as an asset.

Defendants assert the plaintiff is at fault by attempting to collect on only one of the missing loans and by failing to verify with the alleged borrowers whether there was a

dispute regarding the loan itself or its repayment. When taken further, their theory seems to be that, if the fictitious loans are removed from the asset column, the original missing loans should be reinstated. The failure in this logic is that the court cannot attribute value to a loan that is virtually, if not absolutely, uncollectable due to the lack of a note evidencing any indebtedness.

## VIII

### Commercial Loans Generally

Even apart from the forged and fictitious loans identified heretofore, an analysis of SIBC's commercial loan portfolio reveals that the great majority of these loans had little or no value. Although an evaluation of the fair market value of these commercial loans is necessarily a subjective process, it is crystal clear that the fair valuation of SIBC's commercial loans was *far less* than the values reflected on the debtor's books, records, and bankruptcy schedules.

### (A) *FDIC Examination and Analysis.*

FDIC conducted a special examination of SIBC's assets as of April 4, 1983, to determine whether SIBC might qualify for FDIC insurance. FDIC did not conduct an "audit." FDIC's findings, although not conclusive of SIBC's insolvency, clearly support the ultimate finding of the court that SIBC was insolvent during the 90–day preference period. (Px 13.) In its Examination Report, the FDIC classified $20,483,000.00 in commercial loans as "Loss," $9,017,000.00 as "Doubtful," and $4,238,000.00 as "Substandard." According to the FDIC classifications, 100% of the loans classified as "Loss" should be written off, and 50% of those classified as "Doubtful" should be reserved or written off.[14] Ronnie Parham, the examiner in charge of the SIBC examination, testified that 1,283 hours were de-

---

Banking Corp.), 36 B.R. 1010 (Bankr.E.D.Tenn. 1984). *See generally,* testimony of Mark Miller.

**12.** See testimony of Jesse Barr.

**13.** See testimony of Tim Morris.

**14.** Defendants point out that many loans classified by FDIC were later *carried* as good loans by the Bank of Commerce. This fact, however, does not establish that the loans had any value.

voted to the examination at SIBC's offices, and 240 hours were devoted outside the offices. The FDIC examiners prepared a detailed and comprehensive report consisting of some two to three hundred pages and concluded that SIBC was over $22 million insolvent as of April 4, 1983.

The causes of SIBC's insolvency are discussed in great detail in the Examination Report. The report offers substantial documentation that SIBC was not properly supervised by its directors. "Moreover, there appears to be strong evidence that gross mismanagement has occurred with resulting insolvency so severe that rehabilitation will require astronomical amounts of new capital." Px 13 at 1. Specifically, the FDIC examiners found that the directors of SIBC were negligent in failing to provide any type of written loan policies; negligent in permitting loans to be made in excess of applicable laws; negligent in failing to approve, as required by law, an inordinate volume of loans to insiders and their various interests; negligent in condoning a variety of questionable transactions; negligent in permitting SIBC to grant and administer a large amount of commercial loans without a qualified loan officer; negligent in permitting large loans to be made without supporting documentation; negligent in failing to maintain records of loan approvals by the Board or Executive Committee; and negligent in permitting the declaration of a dividend for 1982 in excess of SIBC's net income.

The FDIC examination disclosed a net negative capital of $22,611,000.00 as of April 4, 1983. The report indicated that new capital of almost $23 million would be needed to restore the institution to solvency.

The examiners found that approximately 79% of total loans and 96% of commercial loans were subject to classification; further, that direct and indirect loans to seven borrowers and their corporate interests (C.H. Butcher, Jr., Jacob F. Butcher, David Crabtree, E.R. Ginn, David Payne, Earl Wilson, and Robert Windham) totaling $24,819,000.00 represented approximately 68% of total loan classifications.[15] The examination disclosed the "abusive practice of lending unbelievable sums to insiders, their friends and associates."

"Flagrant mismanagement" of SIBC's resources were found to have occurred, the most damaging transactions involving loans and other arrangements with directors David Crabtree and C.H. Butcher, Jr. Numerous examples of abusive insider dealings, too numerous and in some instances too complicated to set forth herein, are disclosed in sufficient detail to present a clear picture of the nefarious schemes used by Butcher and Crabtree to loot SIBC.

The FDIC found that SIBC had completely disregarded the principle of risk diversification in the granting of commercial loans; that approximately 75% of total commercial loans was vested in eight individuals who were insiders, relatives of insiders, or business associates of insiders. David Crabtree was found to have insulated himself by borrowing through various corporate interests without providing guarantees or endorsements.

FDIC found that SIBC had completely ignored applicable state laws in the granting of loans. Specifically, FDIC found loans exceeding the institution's ten percent lending limitations to insiders and other related interests totaled an "unbelievable" $13,908,000.00. Loans to insiders and their related interests that did not receive the statutory shareholder approval totaled $9,840,000.00. "The figures offer convincing evidence that the institution had completely ignored the applicable laws in the granting of loans." Px 13 at 1–a–4. The institution's capital base during most of 1982 was found to have been only $265,000.00. One loan to Norris Industries, a Butcher and Crabtree entity, was found to have exceeded the statutory limitation by eighteen fold.

FDIC also found that SIBC's income for 1982 had been grossly overstated by the

---

**15.** David Crabtree acquired control of SIBC in 1981. During the relevant time periods C.H. Butcher, Jr. and David Crabtree were directors of SIBC. David Payne was executive vice-president. Wilson, Ginn, and Windham were close associates of Butcher and Crabtree.

inclusion of approximately $1,700,000.00 in uncollected interest on commercial loans; additionally, SIBC deferred recognition of loan losses, further distorting actual earnings. FDIC also found that the percentage of "delinquent loans were significantly understated and most commercial loans stagnant," Px 13 at 1–a–5, with neither principal nor interest being serviced.

SIBC's internal operations, particularly in the area of record keeping, were found to be "extremely disorganized." Audit trails and source documents to support transactions were missing in many instances. Numerous accounts were out of balance and could not be reconciled by examining personnel. Commercial loan posting records consisted of index cards. There were no records of loans that supposedly had been renewed. Duplicate cards were noted in some instances and, in other instances, the cards could not be located.

SIBC's evolution from a recession era "small loan company" to a present day "bank impersonator" is chronicled in considerable detail in the FDIC report. Stock control was found to be held by Crabtree. C.H. Butcher, Jr. appeared to be the dominant management figure and the individual who charted the company's direction. James Steiner, SIBC's president, "lost control" in 1982 when SIBC became a "convenience store" for commercial loans for Butcher, Crabtree, and their related interests.[16]

Defendants contend that the FDIC examination is not probative evidence of SIBC's financial condition because it was not prepared until April 4, 1983, some 25 days after SIBC's bankruptcy petition was filed. They also allege "bias" on the part of FDIC in conducting the examination, but this allegation is completely undocumented. They refer to Mr. Parham's "philosophical objection" to FDIC insuring an institution such as SIBC. Mr. Parham's reasons, however, are clearly and candidly set forth in the report. There is not a scintilla of evidence that the report is anything but a thorough and well-documented analysis of SIBC's plunge into insolvency, followed by bankruptcy and reorganization.

The court categorically rejects any allegation of bias or unfairness on the part of FDIC. On the contrary, the court finds that the report presents convincing relevant evidence setting forth in detail SIBC's slide into insolvency. The FDIC examination is the analysis of SIBC's commercial loans that was made closest in time to the preference period. Gross mismanagement and a total lack of fidelity on the part of its officers and directors are fully documented. "[T]he abusive practice of lending unbelievable sums to insiders, their friends and associates," insider dealings, and other illegal and questionable transactions are not only clearly and succinctly documented in the report but enforced by other persuasive testimony and documents that have been received into evidence. The court specifically finds that there is no evidence that supports any assertion of bias on the part of FDIC in the preparation of its report.

The court has considered the defendants' numerous other objections to the FDIC report including their assertion that the review was merely regulatory and did not determine the fair market value of SIBC's assets. Further, they assert FDIC did not examine all assets. The court finds, however, that the FDIC analysis, although not conclusive, fully supports a finding by this court that SIBC was insolvent on March 10, 1983, and was insolvent during the 90 days prior to that date.

(B) *Arthur Andersen Examination and Analysis.*

The Arthur Andersen accounting firm prepared a report (Px 21J) concerning SIBC's insolvency which was presented at the criminal proceedings of *The United States of America v. C.H. Butcher, Jr. and James E. Steiner,* Criminal Action No. 3–86–0005. It was relied upon by plaintiffs' experts, KMG Main-Hurdman. The report concludes that SIBC was insolvent as early as 1979 and that its insolvency increased each year through 1982:

**16.** In view of the record, it appears doubtful whether Steiner was "in control" in prior years.

| Year | Negative Net Worth |
|------|--------------------|
| 1979 | $595,604.00 |
| 1980 | $663,741.00 |
| 1981 | $717,881.00 |
| 1982 | $19,165,626.00 |

Although the written report is a preliminary report, the court finds that its conclusions are consistent with the testimony of Mr. Shlonsky and Mr. Miller, and with the other evidence in the case, and have not been rebutted by the defendants.

Arthur Andersen's "Auditors' Opinion" states as follows: [17]

### AUDITORS' OPINION

To the Board of Directors of Southern Industrial Banking Corporation:

We have examined the balance sheets of SOUTHERN INDUSTRIAL BANKING CORPORATION as of December 31, 1982, and the related statement of income (loss), shareholders' equity (deficit) and changes in financial position for the year then ended. Our examination was made in accordance with generally accepted auditing standards except as explained in the following paragraph and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

Because of the lack of documentation supporting the Company's commercial loan portfolio, we were unable to obtain sufficient competent evidential matter as to the existence and the collectibility of the loans.

Because we could not examine the documentation supporting the Company's commercial loan portfolio, as noted in the preceding paragraph, the scope of our examination was not sufficient to enable us to express an opinion on the financial statements referred to above.

The Arthur Andersen report states that $17 million in SIBC's commercial loans should have been written off as of December 31, 1982. Although the report does not include an analysis of each loan, this adjustment is consistent with both the FDIC examination, and the testimony of Mr. Shlonsky and Mr. Miller. The court therefore finds that Arthur Andersen's $17 million adjustment to SIBC's net worth to reserve, or write-off for worthless commercial loans at December 31, 1982, is reasonable and supported by other relevant evidence.[18]

The court finds no evidence of any material change in SIBC's financial condition between December 31, 1982, and any other time in the preference period; thus, the Arthur Andersen adjustments for SIBC's commercial loan portfolio are sufficient to establish insolvency during the preference period.

Arthur Andersen's findings include overstatements of net income and net worth from 1979 to 1982 as follows:

| | Overstatement of Net Income | Overstatement of New Worth |
|------|------|------|
| 1979 | $ 1,405,757.00 | $ 1,757,940.00 |
| 1980 | 194,725.00 | 1,952,665.00 |
| 1981 | 1,867,281.00 | 3,819,946.00 |
| 1982 | 18,422,211.00 | 22,242,157.00 |

Considering the fictitious sale of preferred and common stock amounting to $2,000,000.00, not included above but discussed hereafter, SIBC's overstatement of net worth actually totaled $24,242,157.00.

Arthur Andersen found that the major reasons for the overstatements were—

Overstatements of insurance commissions earned

Overstatements of loan fee income

Understatement of loan loss provisions

Fictitious related-party sale/lease-back transactions

Overstatements of finance income earned

Overstatements of value of repossessed property and notes receivable

Fictitious sale of the company's stock

17. All Arthur Andersen's comments and opinions are marked "Preliminary and Tentative."

18. Although Arthur Andersen failed to render a final opinion on the financial statement, generally acceptable auditing procedures were followed, and this report is the closest thing to an actual audit available to the court.

Understatement of dealer reserves

Overstatement of cash surrender value of life insurance

Arthur Andersen's report discusses a "1979 Loan Swap Transaction." On September 28, 1979, SIBC recorded the following journal entry:

| | Amount | Amount |
|---|---|---|
| Debit: | | |
| West Knoxville Investment Company[19] | $565,098.55 | |
| Credit: | | |
| Barry Bradley | | $ 6,286.51 |
| C. H. Butcher, Jr. | | 63,233.82 |
| C. H. Butcher, Jr. | | 57,762.57 |
| C. H. Butcher, Jr. | | 22,075.89 |
| C. H. Butcher, Jr. | | 30,185.13 |
| Clyde Fuller | | 80,000.00 |
| John Lambdin | | 7,499.22 |
| John Lambdin | | 21,375.29 |
| Gil Levison | | 31,015.24 |
| R. G. Meyers | | 23,951.75 |
| Tennessee-Kentucky Cable Co. | | 59,036.77 |
| Roger E. West | | 59,021.16 |
| Tim Vestal | | 103,655.20 |

The journal entry is described by the company's records as follows: "Bookkeeping to Pay Off Notes by West Knoxville Investment Company." No cash was exchanged, however, and the loans that were removed from SIBC's records were not repaid. The transaction was only a paper transaction used to remove old loans from SIBC's records.

The Arthur Andersen report also discusses a 1980 loan swap transaction. On November 24, 1980, SIBC recorded the following journal entry:

| | Amount | Amount |
|---|---|---|
| Debit (A): | | |
| Wilson Properties, Ltd. | $125,000 | |
| Walker Farms, Ltd. | 128,000 | |
| Earl Wilson | 123,000 | |
| John Cunningham | 120,000 | |
| East Tennessee Realty | 124,000 | |
| Bill Deathridge | 60,067 | |
| Brenda A. Crabtree | 127,000 | |
| David A. Crabtree | 129,983 | |
| Credit (B): | | |
| Clifton Anderson | | $ 41,818 |
| C.H. Butcher, Jr. | | 46,651 |
| C.H. Butcher, Jr. | | 104,304 |
| C.H. Butcher, Jr. | | 42,688 |
| C.H. Butcher, Jr. | | 113,122 |
| C.H. Butcher, Jr. | | 67,113 |
| David Crabtree | | 256,983 |
| David Crabtree | | 84,991 |
| David Crabtree, Trustee | | 153,215 |
| Bill Deathridge | | 26,165 |

SIBC prepared checks to the individuals listed above in (A), endorsed the checks and redeposited them into the same bank account on which they were drawn; i.e., the money never changed hands. According to the report, the checks were prepared to provide misleading audit evidence that new loans were made. The money redeposited was reflected on SIBC's records as the payoff of loans listed in (B) above. No cash was exchanged in this transaction, however, and the loans removed from SIBC's records were not repaid. The transaction was prepared to remove related-party loans from SIBC's records and clean up old loans in the loan portfolio.

Arthur Andersen also reviewed the loan portfolio compositions as of December 31, for the years 1979 through 1982, and computed the amounts and percentages of commercial loans that had been made to related parties:

| | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Total Commercial loans | $1,146,162 | $4,230,026 | $18,502,393 | $32,272,746 |
| Commercial loans to related parties | $684,943 | $2,733,498 | $12,913,935 | $26,372,274 |

19. West Knoxville Investment Company was owned and controlled by David Crabtree.

| | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Percentage of related-party loans to total commercial loans | 60% | 65% | 70% | 82% |
| Total certificates and pass-book deposits | $13,190,450 | $22,422,821 | $43,100,261 | $71,523,392 |

Commencing in 1980 SIBC grossly understated its related-party loans [20] in its annual reports:

| | 1980 | 1981 | 1982 |
|---|---|---|---|
| Disclosure in annual report | $1,577,870 | $1,499,731 | $1,748,562 |
| Actual related-party loans | $2,733,498 | $12,913,935 | $26,623,274 |

Arthur Andersen found the understatements to be 73% in 1980, 761% in 1981, and 1,408% in 1982.

According to Arthur Andersen, the dramatic deterioration in SIBC's negative net worth from $717,881.00 in 1981 to $19,165,-626.00 in 1982 was accelerated by the FDIC's coordinated examination of the Butcher banking system comprising some 34 banks. When the FDIC began those examinations on November 1, 1982, it effectively cut off the Butchers and their associates from the easy money available through those banks; for example, as Jessie Barr's deposition testimony establishes, by 1982 Jake Butcher's debt service alone was approximately $2 million per month. He was borrowing money to pay interest on other borrowed money. After November 1, 1982, his supply of money from the family banks came to an end, except for SIBC, the one financial institution that was not under FDIC scrutiny since it was not a federally insured depository.

In December 1982 Jake Butcher borrowed almost $1 million from SIBC, which was used to pay interest on other loans and other personal expenses. Some of the loans were made to other entities; e.g., a $275,000.00 loan to Bull Run Oil Company was made on December 1, 1982, a $300,-000.00 loan to Deere Acres and a $254,-611.08 loan to JFB Farms were made on December 9, 1982. The objective of making the loans to these entities was to disguise the true recipient and purpose. These, and other loans made during the period December 1, 1982, through March 10, 1983, to related parties [21] and Butcher associates totaling some $17,730,464.50,

**20.** In making this determination, Arthur Andersen considered shareholders, management, their immediate families, and controlled entities as related-parties.

**21.** According to the liquidating trustee, "related parties" include C.H. Butcher, Jr., David Crabtree, Jim Steiner, David Payne, Jake Butcher, and some of their associates and entities. When the 84 commercial loans made between December 1, 1982, and March 10, 1983, are closely examined, however, it appears that all closely "related parties" have not been included which would understate the $17 million figure in Px 12D.

clearly establish the massive looting that was taking place at that time. (Px 12D.) The court recognizes that even looting does not necessarily establish insolvency if the looters are able or can be required to repay the funds. The totality of the proof in this case, however, clearly establishes that for the most part the participants themselves were hopelessly insolvent and unable to repay the funds.[22] As of November 1, 1982, their principal money machines had been effectively shut down.

(C) *Liquidating Trustee's Examination and Analysis.*

Using the Main-Hurdman report as a starting point, *infra,* the liquidating trustee, according to the testimony of Mark Miller, analyzed SIBC's commercial loans based upon a number of factors including, but not limited to: (a) SIBC borrowers holding classified loans at other Butcher institutions; (b) loans with no collateral; (c) the payment and collection history of the loans; (d) loans to related entities; (e) loans in violation of state law (10% lending limits); and (f) borrowers who subsequently filed bankruptcy. (Px 12B—12K.)

Px 12B shows the security and payment history of the $31,370,290.37 in commercial loans listed on SIBC's bankruptcy schedules. Loans secured by *any* collateral, without regard to the actual value of the collateral, are listed in the "Secured" column of Px 12B in the total amount of the loan. Loans that were totally unsecured are listed in the "Unsecured" column of Px 12B.

As shown by Px 12B, the loans reported in SIBC's schedules as existing on March 10, 1983, are grossly undersecured. Of approximately $31 million in commercial loans reported by SIBC, only $10.6 million—approximately ⅓—had *any* collateral, and the remaining ⅔ were totally unsecured.

In addition to being undersecured, most of SIBC's commercial loans reported in its

bankruptcy schedules had never been reduced by any payment of principal or interest. Of the approximately $31 million in commercial loans listed on SIBC's bankruptcy schedules, no principal had been paid on over $28 million as of March 10, 1983. (Px 12B.) No principal or interest had been paid on over $25 million of these loans. The loans that were totally unsecured and had no payments of principal or interest totaled $15.6 million, approximately one-half of SIBC's commercial loan portfolio.

Of the $31,370,290.37 in commercial loans reported on SIBC's bankruptcy schedules, there have been total collections of only $4,300,694.23 through June 18, 1986. (Px 12F.) There have been no material collections since that date.

Defendants' criticism of Mr. Miller's testimony is that he is not a CPA nor does he have experience in "valuing" loans. Mr. Miller, however, formerly worked at a bank and has had more than three years experience as an employee of the former bankruptcy trustee and the present liquidating trustee. The court is impressed with Mr. Miller's intimate knowledge and analysis of SIBC's commercial loan portfolio.

(1) *Related Parties*

Approximately 54%, over $24 million, of the approximately $46 million in commercial loans at SIBC on November 30, 1982, were made to related parties. (Px 12C). The pattern of related-party loans continued for the period between December 1, 1982 and March 10, 1983. (Px 12D.) The total amount of new loans made and recorded by SIBC during this time period is $24,062,713.29. Of these new loans, $17,730,464.50, or approximately 74%, were made to related parties.

These findings are consistent with those of the FDIC, which found that SIBC had engaged in "the abusive practice of lending unbelievable sums to insiders, their friends and associates." Px 13 at 1–a.

---

22. Tim Morris, accountant for the trustee in bankruptcy of the C.H. Butcher, Jr. estate, testified that on December 31, 1982, Mr. Butcher was insolvent by approximately $34 million.

Likewise, Mr. Hemphill, an agent of the trustee in the Jake Butcher bankruptcy case, testified that as of March 1983, Mr. Butcher's liabilities exceeded his assets by over $20,000,000.00.

## (2) *Violation of Ten Percent Limitation*

As a Tennessee industrial loan and thrift company, SIBC was statutorily prohibited from making loans to a single borrower which, in the aggregate, exceeded 10% of SIBC's stated capital. Tenn.Code Ann. § 45–5–302 (1980). Px 12J is a summary of all commercial loans at SIBC as of December 10, 1982, for which there were disbursements recorded on SIBC's books. As discussed heretofore, SIBC's bankruptcy schedules listed at least $6,436,822.45 in fictitious loans for which no disbursements were recorded. These loans are not included in Px 12J and 12K (Summary of SIBC Commercial Loans as of March 10, 1983). The total of commercial loans as of December 10, 1982, is $47,849,982.44. Of these, $25,305,451.58 or approximately 53% of SIBC's total commercial loans violated the 10% limitation. This pattern of illegal loans continued throughout the preference period. Approximately 52% of commercial loans as of March 10, 1983, exceeded the 10% limitation. (Px 12K.)

Although violations of the Tennessee statutes are not conclusive as to SIBC's insolvency, it is indicative of the gross mismanagement of that institution as a whole and its flagrant and deliberate violation of controlling and pertinent laws, leading ultimately to its demise.

## (3) *Bankrupt Borrowers*

Px 12H shows the persons and entities with outstanding commercial loans at SIBC as of March 10, 1983, who later became debtors under the Bankruptcy Code. The "Total Due SIBC per Books or Stat. of Affairs" column on Px 12H shows that $11,504,152.00 is due SIBC from such borrowers. Thus, of the $31,370,290.00 of commercial loans outstanding at SIBC as of March 10, 1983, as shown on the schedules, approximately 37% were to borrowers that later became debtors under the Bankruptcy Code.

Defendants counter by asserting that the trustee has filed claims in bankruptcy estates against SIBC borrowers totaling $105 million, and other claims in adversary proceedings of approximately $200 million.

Plaintiff concedes that it expects to recover a minimal percentage from its bankruptcy claims, some $300,000.00 to $400,000.00. There is no proof in the record upon which the court can base any realizable value on the contingent, unliquidated claims asserted by the trustee. They appear to have no value, and had none during the preference period. This finding is indicative of the total lack of worth of many of SIBC's commercial loans and is supported by the findings and conclusion of the FDIC examiners and plaintiff's other witnesses.

## (4) *Other FDIC Examinations*

■ The defendants contend that although SIBC's commercial loans have little or no value now, the plaintiff has not proven that they had little or no value during the preference period. An analysis of FDIC examination reports of other Butcher related banks, however, reveals that many of SIBC's borrowers also had large commercial loans from Butcher related banks and that these loans were adversely classified by the FDIC during and even prior to the preference period. Thus, these examination reports reveal many of SIBC's borrowers were not creditworthy during and prior to the preference period and that the loans to them therefore had little or no value at that time.

Beginning November 1, 1982, the FDIC began a coordinated examination of the affairs of a number of banks in the Butcher banking system. These banks included United American Bank of Hamilton County, United American Bank of Knoxville, City & County Bank of Knox County, City & County Bank of Anderson County, and City & County Bank of Washington County. Other Butcher banks were examined in January and February 1983, including the City & County Bank of Hawkins County, the City & County Bank of Roane County, and the Union County Bank. In examining these banks, the FDIC examiners prepared a "Report of Examination" for each bank which describes the loans made by the bank and classifies each loan according to the maker's ability to repay it. (Px 19A.) The examination reports also contain com-

ments by the FDIC examiners reflecting the credit-worthiness and ability of the makers to repay the loans. (Px 12L summarizes many of these comments.)

A large number of makers of commercial loans with SIBC also had loans with other Butcher related banks that were adversely classified in the examination reports of the banks examined in October and November 1982. (Px 12I–K.) These borrowers' credit-worthiness and ability to repay these loans during the preference period therefore is doubtful. These exhibits and the FDIC's examination reports of other Butcher related banks support the plaintiff's analysis of these loans.

Of SIBC's 171 commercial loans in existence on December 10, 1982, the makers of 56 of these loans had adversely-classified loans with four other Butcher related banks totaling almost $158 million. (Px 12J.) SIBC's commercial loans to these makers totaled $9,553,833.15 (compared to total commercial loans of approximately $31,000,000.00 [23]). Thus, of the total SIBC commercial loans as of December 10, 1982, approximately 35% were to makers with adversely-classified loans at four other Butcher banks.

Similarly, of SIBC's 174 commercial loans in existence on March 10, 1983, the makers of 59 of the loans had adversely-classified loans with four other Butcher related banks totaling $208 million. (Px 12K.) SIBC's commercial loans to these makers totaled $11,001,256.23 (compared to total commercial loans of approximately $31,000,000.00). Thus, of the total SIBC commercial loans as of March 10, 1983, over 30% were to makers with adversely-classified loans at four other Butcher banks. For example, as of November 30, 1982, David Crabtree, individually and through his many business interests, had a total of $19,960,757.22 in loans with SIBC. (Px 12I.) Tabulation of the adversely-classified loans of Crabtree and his business

interests reveals that he had at least $78,-463,000.00 in adversely-classified loans with just four other Butcher related banks as of November 30, 1982. Crabtree's inability to repay these loans is demonstrated by the comment in the Examination Report of UAB–Knoxville with regard to a $933,-000.00 loan to Crabtree: "Mr. Crabtree's total potential liability ... is well in excess of his total resources." Px 19A at 2–a–20; Px 12L at 5. Mr. Crabtree's financial condition was known by the FDIC to be weak, and his financial statements were discredited by the FDIC as of their coordinated exams of November 1, 1982.

The circular relationship between Crabtree's inability to repay his loans and SIBC's financial weakness is further demonstrated by the comment in the Examination Report of the Union County Bank with regard to a $750,000.00 loan to Crabtree: "[R]epayment is dependent upon the financial strength of [SIBC]. The company [SIBC] is apparently in a serious liquidity crisis ... and the future [of] the company is uncertain." Px 12L at 5.

Other comments of the FDIC examiners with regard to common borrowers of SIBC and other Butcher related banks, as summarized in Px 12L, also support the finding that during the preference period many of SIBC's commercial loans were made to borrowers who lacked the ability to repay their loans.

(D) *KMG Main-Hurdman Examination and Analysis.*

■ The findings with respect to SIBC's commercial loans made by plaintiff's expert witness, KMG Main-Hurdman, are set forth in Px 15Q. Main-Hurdman's analysis addressed primarily those commercial loans which were on SIBC's books continuously from November 30, 1982 through March 10, 1983 (83 loans totaling $12,611,616.12 as of November 30, 1982). Main-Hurdman's representative, Mr. Roger Shlonsky,[24] testi-

---

**23.** This figure excludes approximately $12.6 million in participations purchased by SIBC from UAB–Knoxville on a short term basis.

**24.** Defendants represented by David Buuck in these proceedings contend Mr. Shlonsky is not

qualified to testify as an expert in this court by virtue of the Tennessee Accountancy Act of 1980 ("the act"). See Tenn.Code Ann. §§ 62–1–101 through 120 (1986). The act, in essence, prohibits the "practice of public accountancy" in the

fied that an examination of these commercial loans as of November 30, 1982, would have resulted in a commercial loan loss reserve for this group of loans of $7,738,-750.26. In making its final adjustment to SIBC's balance sheet however, Main-Hurdman did not reserve this full amount. Instead, it reserved only $5,532,548.18, giving credit for all payments made by the borrowers on these loans through June 18, 1986.

Main-Hurdman's conclusions, when considered in light of all testimony before the court, are sufficient to establish SIBC's insolvency throughout the preference period. Main-Hurdman's $5,532,548.18 reserve for commercial loans was established for loans on SIBC's books continuously throughout the preference period—December 10, 1982 through March 10, 1983.

Defendants challenge Mr. Shlonsky's and Main-Hurdman's $5,532,548.18 reserve for commercial loans as of November 30, 1982. They assert that Mr. Shlonsky has not performed an audit of the books and records of SIBC for any period, including any date during the preference period. They further assert that he has not performed all of the procedures required by generally accepted auditing standards in connection with the review of loans for determining proper loan reserves. Defendants insist Mr. Shlonsky erred when he considered demand notes delinquent where no demand had been made during the preference period. Additionally, he simply drew "conclusions" concerning the borrowers' ability to repay when he determined their notes were delinquent. Various other criticisms of Mr. Shlonsky's "methodology" are also propounded by the defendants.

The court has carefully reviewed the deficiencies asserted by the defendants and finds that they go only to the weight to be given to Mr. Shlonsky's testimony. It is clear to the court that demands were not made by SIBC on numerous borrowers simply because many of these loans had been made with no intention on the part of management to require repayment. It is also clear that many of the loans were made to borrowers with no ability to repay. In spite of the fact that no demand for repayment has been made, the record is replete with substantial evidence that they had neither the ability nor any intention to repay.

The court finds that Main-Hurdman's adjustments are reasonable and that they are consistent with the write-offs as determined by the FDIC in its examination, as well as other relevant evidence.

## IX

### KMG Main-Hurdman, Other Conclusions

#### (A) Installment Loan Interest

Over a seven-month period beginning in May 1982, SIBC's president, Mr. James Steiner, instructed SIBC's bookkeeper, Ms. Patricia Smithson, to increase by arbitrary amounts the interest income reported on the general ledger of SIBC's installment loans. In some months Steiner instructed Ms. Smithson to add arbitrary round numbers, e.g., $100,000.00 or $150,000.00, to the true interest income. In other months, he simply instructed her to round the interest income up to a certain figure, e.g., $750,-000.00. The effect of these manipulations of SIBC's books was to inflate SIBC's net worth in 1982 by at least $1,145,938.00:

| Month | As Recorded by SIBC | As Computed Each Month | Overstatement of Income |
|---|---|---|---|
| January | $ 418,093 | $ 418,093 | $ –0– |
| February | 426,442 | 426,442 | –0– |
| March | 442,278 | 442,278 | –0– |

state of Tennessee, including rendering a professional opinion on financial statements, in courts of law or equity, without a valid certificate. Mr. Shlonsky has not been issued such a certificate in the state of Tennessee. He is, however, a licensed public accountant in the states of Maryland and Illinois. This fact, coupled with his impressive qualifications, undoubtedly qualifies him as an expert under Fed.R.Evid. 702.

| Month | As Recorded by SIBC | As Computed Each Month | Overstatement of Income |
|---|---|---|---|
| April | $ 469,841 | $ 469,841 | $ –0– |
| May | 632,345 | 482,345 | 150,000 |
| June | 683,102 | 533,102 | 150,000 |
| July | 604,648 | 504,648 | 100,000 |
| August | 648,933 | 498,933 | 150,000 |
| September | 750,000 | 509,670 | 240,330 |
| October | 750,000 | 509,799 | 240,201 |
| November | 618,464 | 503,057 | 115,407 |
| | $6,444,146 | $5,298,208 | $1,145,938 |

Correction of Installment Loan Interest, Eleven Months Ended November 30, 1982. Px 15E.

Defendant's theory that such additional income was income properly recognized under the "Rule of Anticipation" is not supported by the evidence. First, Mr. Steiner refused to testify concerning this (or any other) subject. Second, although Ms. Smithson testified that Steiner had mentioned that the increases were due to changes in the computer system, she also testified that SIBC's computer system was fully operational at all times. Moreover, change in the computer system would not explain such arbitrary increases in income.

Defendants' expert's, Mr. Elkins', theories regarding such additional income are not supported by the evidence and are contradicted by the other expert witnesses, including Mr. Cosby, another expert witness for defendants.[25] Moreover, the statute relied upon by Mr. Elkins, Tenn.Code Ann. § 45-5-402 (1980), does not deal with the reporting of income; but addresses only the rebate of unearned finance charges. Mr. Elkins admitted that he only learned of the "Rule of Anticipation" from Mr. Steiner while assisting in the defense of Mr. Steiner and Mr. Butcher in their recent criminal case, that he had never heard of any other accountants who accept-

ed it as a proper method of recognizing income, and that as far as he knew only Mr. Butcher, Mr. Steiner, and he had ever accepted it as a proper method of recognizing or reporting income.

The court finds that the "Rule of Anticipation" was not a proper method for reporting SIBC's income from interest on installment loans. Accordingly, to properly reflect SIBC's net worth, a reduction of $1,145,938.00 from SIBC's net worth must be made from its balance sheets for all times during the preference period.

Plaintiff asserts Mr. Elkins' testimony is further suspect considering opinions he has expressed at this trial and in prior testimony which would demonstrate SIBC's insolvency during the preference period but for the "Rule of Anticipation." Mr. Elkins' testimony and prior opinions, as summarized in Px 21E, show that he agrees with the following adjustments decreasing SIBC's alleged net worth as of its December 31, 1982 balance sheet:

| Insurance commissions | [$ 574,650][26] |
|---|---|
| Sale/lease-back | [ 983,559] |

Elkins' parents are defendants in these proceedings, with an action pending against them in the amount of $10,000.00.

25. During the course of the trial, plaintiff made an oral motion to recall Mr. Elkins for additional cross-examination after he previously had been excused. The court granted the motion on the grounds of newly discovered evidence that Elkins was not an "independent expert." In this re-cross examination, it was developed that Mr.

26. During re-direct examination, Mr. Elkins "corrected" this figure to reflect $115,000.00.

| | |
|---|---|
| Sale/lease-back lost property | [ $143,000] |
| Installment loan loss reserve | [ 287,301] |
| Cash surrender value of life insurance | [ 84,354] |
| Commercial loan loss reserve | [ 970,000] |
| Scruples loan | [ 125,000] |
| Commercial loan interest never collected | [ 1,105,811] |
| Forgeries (selected) | [ 1,280,000] |
| TOTAL | $5,553,675 |

Further, Mr. Elkins earlier agreed that the $1 million adjustment for the alleged purchase of SIBC's preferred stock by West Knoxville Investments in December 1982 should be reversed. (Px 21E.) Although he does not now concede the propriety of that adjustment, he earlier characterized it as an instance in which Crabtree "slicked" Steiner and Butcher, and then noted that "Crabtree must have been out of control." Px 21A at 6.

When these adjustments are deducted from SIBC's asserted net worth as of December 31, 1982, as per their internal balance sheets, it reveals that SIBC was insolvent by at least $1,477,133.57. Although Mr. Elkins contended that it was "double-dipping" to deduct both for a 3% commercial loan loss reserve, the uncollected loan income, the Scruples loan, and the conceded forgeries, such "double-dipping" can be eliminated simply by reducing the $970,-000.00 commercial loan loss adjustment by 3% of the latter specific adjustments, or $75,324.33 ($125,000 × 3% + $1,105,811 × 3%, plus $1,280,000 × 3%). Even after making these adjustments, the combined effect of Mr. Elkins' present and previously stated opinions show that SIBC was insolvent on December 31, 1982, unless the court were to adopt the view that the "Rule of Anticipation" was a proper method of recognizing and reporting income. The court heretofore has declined to do so.

(B) *Installment Loan Loss Reserve*

To accurately reflect their true financial condition, most financial institutions such as SIBC maintain a "loan loss reserve" for potential losses. The loan loss reserve rate generally corresponds with the institution's bad debt experience. SIBC, however, had no established policy regarding charge-offs of bad debts. Because of the lack of a consistent charge-off policy, SIBC's history of charge-offs is not a reliable indication of an acceptable loan loss reserve.

■ According to Mr. Shlonsky, the national average delinquency rate has been about 3% of total loans. In comparison, SIBC's delinquent loan rate, from 1978 through November 1982, averaged approximately 6% of its total loans. Furthermore, this figure is diluted because it is apparent that SIBC "rolled over" many loans and never recognized the loss. Despite its delinquent loan rate of almost 6%, its liberal "rollovers," and lack of a charge-off policy, SIBC maintained a loan loss reserve of only 3% in 1978. In 1979, SIBC decreased its loan loss reserve rate to 1.5%, yet the delinquent loan rate remained around 6%. In November 1982, SIBC reported on its books a loan loss reserve of $574,287.18, based on a loss reserve rate of 1.5%. (Px 15N.) Had SIBC maintained the appropriate loan loss reserve rate of 6%, it should have recorded a loan loss reserve of at least $2,215,247.00. (Px 15N.) As a result of its underreporting of recognizable loan losses, SIBC overstated its net worth in 1982 by at least $1,640,960.00 (Px 15A and 15N.) Accordingly, to reflect SIBC's net worth properly, a reduction of at least $1,640,960.00 must be made from its balance sheets for any time during the preference period.

(C) *Loan Fees and Insurance Commissions*

Typically, when SIBC made an installment loan it charged a pre-paid loan fee and life insurance commission. It recognized income for such pre-paid loan fees and insurance commissions in accordance with the Rule of 78's, as required by generally accepted accounting principles. This method requires such fees to be recognized as income over the life of the loan.

Starting in 1979, however, SIBC began recognizing all of these fees and commissions as income immediately when a loan was made. However, Ms. Smithson kept a separate record of SIBC's true income from such fees and commissions, while fol-

lowing Mr. Steiner's instructions for posting the inflated income to the general ledger.

 These improper accounting methods as to unearned insurance commissions falsely inflated SIBC's income and net worth as of November 30, 1982, by at least $514,217.00. Accordingly, to properly reflect SIBC's net worth, a reduction of $514,217.00 must be made from its balance sheets for any time during the preference period. (Px 15A.)

With reference to the loan fees, SIBC recognized the entire amount of all loan fees as income when installment loans were made. It was permissible for SIBC to recognize some additional income for loan fees, to the extent that it incurred costs in making the loans that were reasonably related to that income. And, although the evidence shows that SIBC made no effort to establish those costs, the court does not find that SIBC's net worth as of November 30, 1982, should be reduced by the $1,203,541.00 adjustment proposed by Mr. Shlonsky. (Px 15A.)

### (D) Sale/Lease-back Transactions

On the last day of 1981, SIBC engaged in two purported sale/lease-backs that were nothing more than bogus transactions designed to inflate falsely its income and net worth at year end 1981. SIBC's own income statements show that it lost $155,949.84 through November 1981. (Its loss in the month of November totaled $58,136.07). (Px 10K.) After entering into these bogus transactions, however, SIBC reported a net gain of $983,559.00 on the sale of this property, enabling it to report net income of $422,682.00 for the year. (Px 15F, Px 10L.) In other words, these phony transactions allowed SIBC to show a profit for 1981, where it otherwise would have shown a loss of approximately $560,000.00. Because this income was reflected in its retained earnings and shareholders equity, it also falsely inflated SIBC's net worth. Details of the transactions follow.

### (1) Merchants Road Property

SIBC owned real property that it purchased for $143,000.00. In December 1981, SIBC obtained an appraisal of this property which was grossly inflated—by as much as $500,000.00. The appraiser testified that the appraisal was false and done as a "favor" to SIBC officers. Armed with this phony appraisal (Px 10E), SIBC sold the property on December 31, 1981, to its director, Mr. David Crabtree, a/k/a West Knoxville Investment Company ("WKIC"), for the inflated appraised value of $643,000.00. SIBC booked a "gain" on the sale of $500,000.00 which it took into income on December 31, 1981.

WKIC made no cash payment on the property. Instead, it gave SIBC an unsecured note for the full purchase price. (Px 10D and Px 10I.) It also leased the property back to SIBC. (Px 10G and Px 10H.) The monthly payments from WKIC to SIBC on the note, however, were less than SIBC's payments to WKIC on the lease. The net result of the lease payments made by SIBC and the note payments made to it by WKIC was that SIBC was paying out more per month than it received for the use of property it formerly owned. Over the life of this transaction, SIBC would have paid out in lease payments approximately $1,964,635.00 more than it would have received in note payments. (Px 15L.)

SIBC did not perfect a lien or mortgage on this property. WKIC, however, mortgaged the property to Knox Federal Savings and Loan concurrently with its purchase to secure a $500,000.00 note. Subsequently, Knox Federal foreclosed its mortgage on the property.

Arthur Andersen's summary of this transaction states:

This transaction was a fictitious sale of property at highly inflated values which allowed SIBC to recognize a fictitious accounting gain of $500,000 and increase its net common stock by $500,000 (increase in net worth).

In the same transaction, SIBC also sold $1 million of repossessed property to WKIC. Arthur Andersen notes that SIBC also erroneously failed to provide for losses

of approximately $230,000.00 on the $1 million of repossessed property.

### (2) *Morristown Property*

SIBC owned land and its office building in Morristown, Tennessee, acquired at a cost of $326,000.00. SIBC sold this property on December 31, 1981, to East Tennessee Equity, Ltd. (a limited partnership having as limited partners James Steiner, SIBC's president, and other insiders and related parties) for $809,559.00, an amount in excess of the property's fair market value. (Px 15K.) Again, the sales price was supported by a false appraisal done as a "favor" to SIBC's officers. (Px 11E.) SIBC booked a gain on this sale of $483,-559.00, which it took into income on December 31, 1981.

East Tennessee Equity made no cash payment for the property. Instead, it gave SIBC two notes totaling the full purchase price of $809,559.00. (Px 11I and Px 11J.) It also leased the property back to SIBC. The monthly payments by East Tennessee Equity to SIBC on the notes were less than SIBC's monthly payments on the lease. The net result of the lease payments made by SIBC and the note payments made to it by East Tennessee Equity was that SIBC was paying more per month than it received for property it formerly owned. Over the life of this transaction SIBC would lose more than $418,602.00. (Px 15M.)

Arthur Andersen's report summarizes the Morristown property transaction as follows:

> This transaction was a fictitious sale of property at highly inflated values which allowed SIBC to recognize a fictitious accounting gain of $483,559.

The Merchants Road and Morristown property transactions were without economic substance. Both were solely for the benefit of the purchasers, WKIC and East Tennessee Equity. SIBC received no net economic benefit from either transaction. Both were designed solely to inflate SIBC's income and net worth by $983,559.00 at year-end 1981. Further, the inflation of SIBC's 1981 income enabled the insiders to further loot the company by declaring a substantial stock dividend in December 1981.

The court finds that the recognition of the "gain" was improper for a number of reasons. When the proper accounting adjustments are made for these two transactions, it results in a $993,559.00 decrease of SIBC's net worth. (Px 15F.)

### (E) *Preferred Stock Transaction*

Defendants also contend that a December 1982 sale of preferred stock to WKIC increased SIBC's net worth by $1,000,000.00. The evidence shows, however, that this was a sham transaction, and that SIBC had, in fact, contributed the $1 million that WKIC used to "purchase" its stock.

SIBC first paid $1,000,000.00 to Northridge Development Corp., a subsidiary of WKIC. (Px 16B.) The recited consideration was certain real estate. SIBC's subsidiary, Tennessee Lawn and Tractor ("TLT"), only acquired the real estate several months later. When it did, the real estate was encumbered by approximately $1 million in liens, and there was no equity in the realty for SIBC or TLT. Northridge Development then transferred most of these sums to WKIC. (Px 16C.) Southern Resources, Inc., another WKIC subsidiary, gave WKIC another $50,000.00. (Px 16D.) WKIC then used these funds to "purchase" $1,000,000.00 in SIBC preferred stock. (Px 16E.)

Mr. Elkins described this as an instance when Crabtree was "out of control" and "slicked" Butcher and Steiner. This transaction did not increase either SIBC's net assets or its capital stock.

The Arthur Andersen report summarizes this transaction as follows:

> This transaction was a fictitious increase in SIBC's preferred stock (net worth) as the funds used to purchase the stock came from SIBC. There was no new cash invested in SIBC as a result of the above transaction. The net effect of the transaction was to improperly increase SIBC's assets and net worth.

The net worth on SIBC's balance sheet must be reduced by $1,000,000.00.

### (F) *ESOP Transaction*

Defendants contend that SIBC's net worth was increased by a million dollar stock purchase by an employee stock ownership plan. The evidence, however, shows that this transaction was never consummated.

On December 31, 1982, SIBC recorded the issuance of 66,667 shares of common stock to its Employee Stock Ownership Plan ("ESOP") for $15.00 per share, or approximately $1 million. On December 31, 1982, SIBC received $1 million credit to its checking account from United American Bank ("UAB"). (Px 17B.) SIBC recorded this as if it were payment for the stock sold to the ESOP; however, SIBC's bank statement and the advice from UAB show that these were borrowed funds. Additionally, UAB charged SIBC interest daily on these borrowed funds. On February 4, 1983, SIBC recorded the reversal of the common stock issuance on its books, indicating the transactions were not completed. SIBC repaid UAB the $1 million borrowed funds in February 1983.

SIBC incorrectly increased its net worth by $1 million in December 1982 by recording borrowed funds received from UAB as equity rather than as a liability. Because SIBC's December 31, 1982, balance sheet included $1 million in capital as a result of this transaction, SIBC's alleged net worth must be reduced by $1 million.

### X

### *Income Tax Returns*

■ Defendants introduced tax returns for the 1982, 1983, and 1984 tax years. The 1982 return was signed by Irwin A. Deutscher, the Chapter 11 bankruptcy trustee; the 1983 return was signed by plaintiff; and the 1984 return was signed by a representative of the successor in interest to the reorganized debtor. The incorporated balance sheets (Schedule L) for 1982 and 1983 show that debtor's assets exceed liabilities. However, for the reasons set forth below, the court finds that these tax returns and the incorporated balance sheets are not sufficient proof that SIBC was solvent during the preference period.

First, no audit or independent investigation was conducted by the tax preparer to determine the fair valuation of assets. Second, the tax returns and balance sheets do not report assets at fair valuation; instead, they report historical cost or basis. Third, Mr. Hopkinson of Peat, Marwick & Mitchell did not investigate the fair valuation of SIBC's assets. Fourth, the tax returns were prepared from SIBC's books and records, which the court has already found to be untrustworthy. Fifth, and related to number four, the duty of a trustee is limited to filing tax returns from a debtor's books and records, and such information as is available. 11 U.S.C.A. § 1106 (West 1979 & Supp.1986). Thus, the court finds that the tax returns and related schedules are not reliable evidence of fair valuation of assets.

■ Regardless of whether the trustee was under a duty to amend the tax returns under the Internal Revenue Code, as insisted by defendants, such failure could in no way affect the solvency or insolvency of SIBC during the preference period.

The United States District Court recognized the questionable value of these same exhibits when it excluded SIBC's tax returns from evidence in the criminal proceedings styled *The United States of America v. C.H. Butcher, Jr. and James E. Steiner*, Criminal Action No. 3–86–0005. In that case, Mr. Butcher and Mr. Steiner sought to introduce SIBC's tax returns for precisely the same reason: to show that SIBC was not insolvent as the government's witnesses had testified. As in this case, they attempted to introduce these exhibits through Mr. Stanley Roy, CPA. The District Court ruled unambiguously that SIBC's tax returns were inadmissible because they were not relevant to prove its solvency. Although this court permitted the introduction of the tax returns, the court is satisfied that in no way do they establish SIBC's solvency.

## XI

### Trustee's Applications

■ On July 1, 1983, Irwin A. Deutscher, the Chapter 11 trustee, submitted to the State Department of Insurance applications to renew SIBC's certificate of authority to do business as an industrial loan and thrift company. (Dx 11(1).) The assistant commissioner in charge of supervising loan and thrift companies replied to those applications requesting a more recent financial statement, noting that the applicant was "in receivership." Mr. Deutscher responded and enclosed a financial statement dated May 31, 1983. Deutscher's letter indicated that the financial statement was "contained in our Court Report as of 5/31/83." See Trustee's Preliminary Valuation Report, Dx 11(3). Although the financial statement which is a part of this exhibit shows SIBC's assets exceed liabilities by almost $5 million, it shows on its face that it is unaudited and prepared by SIBC's bookkeeper from SIBC's books and records.

The court finds these documents to be insufficient evidence to rebut plaintiff's overwhelming proof that SIBC was insolvent during the preference period. The applications were submitted under special circumstances; failure to submit the applications would have caused SIBC's certificate of authority to lapse, thereby eliminating any chance to qualify for remedial legislation drafted to assist SIBC's reorganization. The State of Tennessee never took any action on the applications and, had SIBC's plan of reorganization taking advantage of the remedial legislation not been confirmed, the State would have scheduled a show cause hearing to suspend SIBC's Certificate of Authority. The documents, Dx 11(1), 11(2), and 11(3), taken as a whole, demonstrate that the information was from SIBC's books and records, was unaudited, and was not intended to be a representation of the fair valuation of debtor's assets. For instance, the last financial statement and letter, Dx 11(3), make clear reference to the Trustee's Court Report of May 31, 1983. That report contains the trustee's preliminary valuation of debtor's assets and reflects substantial reductions of the values as stated in debtor's books and records. (Px 22.)

## XII

### Conclusion

■ At all times during the preference period, December 10, 1982, to March 10, 1983, SIBC was insolvent—the sum of its debts was greater than all of its property, at a fair valuation. 11 U.S.C.A. § 101(29). (West Supp.1986.) Plaintiff, by a vast preponderance of the evidence, has therefore established the third element of a preference, insolvency. 11 U.S.C.A. § 547(b)(3) (West 1979).

SIBC was not only insolvent, it was massively insolvent. Arthur Andersen's report indicates that SIBC became insolvent in 1979, with a negative net worth of $595,604.00. According to Arthur Anderson, by December 31, 1982, SIBC's negative net worth totaled $19,165,626.00.

As of November 30, 1982, SIBC's internal balance sheet reflects a net worth of $3,437,101.00. This court has heretofore found SIBC's records untrustworthy. The court finds that SIBC's purported net worth of $3,437,101.00, as of November 30, 1982, must be reduced, at a minimum, as follows:

| | |
|---|---|
| Adjustment to commercial loan loss reserve | $ 5,532,548 |
| Adjustment to installment loan loss reserve | 1,640,960 |
| Correction of installment loan interest | 1,145,938 |
| Correction of unearned insurance commissions | 514,217 |
| Sale/lease-back transactions | 983,559 |
| Forgeries | 599,994 |
| Fictitious loans | 3,573,559 |
| Fictitious sale of preferred stock to West Knoxville Investment Company | 1,000,000 |
| Cash surrender value life insurance | 84,354 |
| | $15,075,129 |

Thus, as of November 30, 1982, SIBC was insolvent by not less than $11,638,028 ($3,437,101 minus $15,075,129).

Between November 30, 1982, and March 10, 1983, there was no improvement in SIBC's financial condition. On the con-

trary, SIBC's financial condition deteriorated rapidly. Due to withdrawals by its customers, certificate and passbook deposits decreased from $71,523,392.00 to $50,164,774.16. Forgeries increased from $599,994.00 to $4,106,724.67; fictitious accounts increased from $3,573,559.00 to $4,739,328.78. New loans to C.H. Butcher, Jr., David Crabtree, James Steiner, David Payne and Jake Butcher totaled $17,730,464.50 [27] out of total loans made and recorded of $24,062,713.29, with credits and collections totaling only $6,581,750.82.[28] Almost $13 million of the new loans were listed in SIBC bankruptcy schedules as still owing on March 10, 1983.

SIBC continued to prepare financial statements through March 10, 1983, all completely untrustworthy. As of that date SIBC's balance sheet indicated a net worth of $4,386,856.64.[29] This net worth figure, however, must be reduced, at a minimum, as follows:

| | |
|---|---|
| Adjustment to commercial loan loss reserve (excluding forgeries and fictitious loans) | $10,000,000 [30] |
| Forgeries | 4,106,724 |
| Fictitious loans | 4,739,328 |
| Adjustment to installment loan loss reserve | 1,640,960 |
| Correction of unearned insurance commissions | 514,217 |
| Sale/lease-back transactions | 983,559 |
| Fictitious sale of preferred stock to West Knoxville Investment Company | 1,000,000 |
| Fictitious sale of common stock, Employee Stock Ownership Plan | 1,000,000 |
| | $23,984,788 |

Thus, as of March 10, 1983, SIBC's purported net worth, as reflected by its internal balance sheet, must be reduced by $23,-984,788.00, leaving SIBC insolvent in the amount of $19,597,932.00.

The trustee has conclusively established that SIBC was insolvent on November 30, 1982, and all times thereafter.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.

---

27. New loans to C.H. Butcher, Jr. and David Crabtree totaled over $14 million.

28. Loans that disappeared or were sold totaled $4,879,578.98.

29. SIBC filed bankruptcy schedules reflecting it was $2,411,513.41 insolvent as of the same date.

30. The court believes this to be a conservative figure. FDIC believed $24,991,500.00 in commercial loans should be written off. Arthur Andersen's report states that $17,000,000.00 in commercial loans should have been written off as of December 31, 1982. KMG Main-Hurdman's conservative adjustment as of November 30, 1982 amounted to $5,532,548.00. (This reserve was established only for loans on SIBC's books continuously throughout the preference period.) The liquidating trustee, using the KMG Main-Hurdman report as a starting point, analyzed the commercial loans based upon a number of factors and concluded that the fair valuation of the commercial loans listed in SIBC's bankruptcy schedules was much less than indicated.